Nathan FISCHER, a minor, by his parents, Roland FISCHER and Mary Ann Fischer, Plaintiffs,

v.

ROCHESTER COMMUNITY SCHOOLS, Defendant.

Civ. No. 90–72101.

United States District Court, E.D. Michigan, S.D.

Dec. 20, 1991.

Marsha Lynn Tuck, Bingham Farms, Mich., for plaintiffs.

Christine Nover, Birmingham, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This is an action for attorney's fees for services rendered pursuant to the Handicapped Children's Protection Act, as amended, 20 U.S.C. §§ 1415–1461 (1986). Plaintiffs seek fees for the services of their attorney during discussion with their school district of a matter which was resolved prior to either litigation in this Court or the scheduling of the statutorily provided administrative hearing, and also seek fees incurred during this litigation, which has been tried to the bench. This memorandum constitutes the findings of fact and conclusions of law of this court.

Nathan Fischer was born September 6, 1983, and resides with his family in Rochester Hills, Oakland County, Michigan. He was born with a syndrome known as "Fragile X", was determined by the Defendant school district (after evaluation, in 1986) to be eligible for special education services under the Individuals with Disabilities Education Act, formerly the Education for All Handicapped Children Act, 20 U.S.C. § 1400 et seq. (1988) and received Pre-primary Impaired special education services from Defendant in 1987, 1988 and 1989. He attended preschool at Oakland County's Irving School for physically and mentally impaired children from January 1986 to January 1987, when that class was dissolved, and thereafter a weekly occupational therapy class at the Irving School, which was outside of the Rochester School District, but to which he had been referred by the Defendant. He attended pre-primary programs within the district. By the Spring of 1989, when it was time to plan Nathan's entry into kindergarten the next fall, he had already attended special preschool at Irving, Brookland, and Harper Elementary Schools, as well as two regular preschool programs concurrently, because his parents felt he would benefit from association with peers without handicaps. Because he had attended so many schools, his parents were particularly desirous that he start kindergarten at the new school which was to open in their own neighborhood that

fall, Musson, but which would offer no special education program.

Nathan's mother is a teacher in the Rochester Community Schools, and is a founder and President of the Michigan Chapter of the Fragile X Association. She has lectured on the syndrome, edited the treatise of the world's leading authority on the subject, and is editor of the National Fragile X Foundation Newsletter. Nathan's father is an automotive engineer.

Mrs. Fischer testified that Nathan's syndrome is a neurological handicap which manifests itself behaviorally as a sensory integration dysfunction. He is either hypo- or hyper-reactive to various stimuli, such as noise and touch, and had occasional panic attacks, at that time. Although he was academically ready for kindergarten, he had a shorter attention span than normal, was delayed in motor skills and language, and had the need for guidance and assistance in toileting, *inter alia.*

In the Spring of 1989, Mrs. Fischer drove Defendant's Director of Special Education, Dr. Cherie Simpson, out to the Irving School to see that program, which Mrs. Fischer felt was a good one and hoped to see duplicated in some respects when Nathan started kindergarten. They discussed Nathan's needs and his parents' hopes for him at length, and Dr. Simpson thereafter had Mrs. Fischer speak to the Special Education Department concerning the Fragile X Syndrome. Later, while Dr. Simpson was on vacation, the time arrived for Nathan's "Individualized Educational Planning Conference" to be convened, in accordance with both state and federal statutes and regulations, to develop the statutorily required "Individualized Education Program" for Nathan for the Fall of 1989, when he would enter kindergarten.

The Individuals with Disabilities Education Act (IDEA), formerly the Education of the Handicapped Act (EHA), 20 U.S.C. §§ 1400–1461 (1988), conditions federal financing of state special education programs upon the states' assurance to all children with disabilities the right to a free appropriate education. 20 U.S.C. §§ 1400(c), 1401(a)(18), 1412(1), and 1412(2)(C) (1988). In furtherance of this policy, the IDEA requires state and local educational agencies to establish procedures to assure that children with disabilities and their parents are guaranteed certain procedural safeguards with respect to the provisions of a free appropriate public education. 20 U.S.C. § 1415(a) (1988). Among those procedural safeguards are notice of proposed individualized education programs, 20 U.S.C. § 1415(b)(1)(C) (1988), and "an opportunity to present complaints with respect to" such programs. 20 U.S.C. § 1415(b)(1)(E) (1988).

School districts are required to provide an appropriate education program for each student. The Supreme Court has defined an appropriate educational program under the IDEA as one consisting of "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Hendrick Hudson District Board of Education v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

The Rochester School District convened an "Individualized Education Placement Committee (IEPC) meeting to develop Nathan's plan on June 8, 1989, and continued the meeting on July 13, 1989. Those present at the meetings included Dr. Elinor White, Assistant Director of Special Education (in the absence of the Director, Dr. Simpson), Nathan's parents, his former teacher in the pre-primary impaired program, Carol Blender, and others. The program options for Nathan which were discussed included the following:

1. Placement in a learning-disabled school outside the district. This option was rejected by all participants, as unnecessary and inappropriate.

2. Placement in a district classroom for disabled children. This option was the initial choice of Nathan's pre-primary special education teacher, who testified that his needs for special attention were great. However, she ultimately conceded that the value of mainstreaming experience for Na-

than made the third option more appropriate.

3. The integrated kindergarten program—offered in Rochester only at the Hamlin Elementary School—in which all of the special support services of a disabled program were offered for approximately 5 children, who were integrated into a class of as many as 23 altogether, the balance having no disability at all. The program had been developed on the basis of the developing national thought that disabled children would benefit from socialization with their peers. It was team-taught by special and regular education kindergarten teachers with the support of occupational, physical, and speech therapists and paraprofessionals, to meet the needs of the entire integrated group.[1] Rooms at Hamlin were fitted to accommodate the many special needs of the program.

4. Enrollment, without support, in the regular kindergarten of the home school, Musson Elementary.

It appears that the entire committee, including Nathan's parents, agreed as early as June 8th that Nathan's most appropriate and least restrictive environment would be the integrated kindergarten. The parents, however, took the position that the program should be provided at the Musson Elementary School. Although Nathan's parents testified that they did not ask that the program be moved, but only that Nathan be enrolled at Musson "with all appropriate support", the court credits the testimony of the Defendant's witnesses who uniformly stated that the Fischers asked that the program be moved to Musson, and identified other students in the Musson area who would benefit from the program if moved or duplicated there. The Defendant's witnesses clearly understood, from what the parents were saying, that only the full program, at Musson, would be satisfactory. The Fischers concede that they did insist upon Musson, "with all appropriate support", at all times; and acknowledged that they never agreed, during the June and July meetings, that any less support than the entire Hamlin program would be acceptable as "appropriate."

The Fischers' insistence upon Musson was based upon its proximity to their home, in contrast to the Hamlin location approximately eight miles away, which Mrs. Fischer testified would have required a thirty-five minute bus ride for Nathan. They also testified to their concern that he be socialized with his peers in his own neighborhood, among children with the potential for becoming real friends.

The June 8th meeting ended inconclusively, and at the end of the July 13, 1989, meeting, Nathan's parents asked for a few days to consider their response to the recommendation of the balance of the committee that Nathan be placed in the integrated kindergarten program at Hamlin. They had agreed that every facet of the program itself was appropriate for Nathan, but still argued that Musson School was where he should be enrolled. Dr. White reported to Dr. Simpson that she thought they would accept the committee's recommendation that he enter the Hamlin integrated program, after a few days' consideration.

---

1. It must be noted in this regard that the "national thought" to which the Defendant's special education staff testified included that of the Congress, which stated in the preamble to the Education of the Handicapped Act, at 20 U.S.C. § 1400(b).

The Congress finds that:

. . . . .

(3) More than half of the handicapped children in the United States do not receive appropriate educational services which would enable them to have full equality of opportunity.

(4) One million of the handicapped children in the United States are excluded entirely from the public school system and will not go through the educational process with their peers.

Further, at 20 U.S.C. § 1412(5), Congress required that state procedures assure ". . . . that, to the maximum extent appropriate, handicapped children . . . are educated with children who are not handicapped, and that . . . . removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily . . . ."

On July 17, 1989, the Fischers notified the school district by letter that they disagreed with the IEP presented for Nathan and requested the due process hearing on their complaint, provided for parents at 20 U.S.C. § 1415(b)(2) (1988), which states:

> Whenever a complaint has been received . . . the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or intermediate educational unit, as determined by State law or by the State educational agency.

Dr. Simpson, who had been relieved to hear from Dr. White that the Fischers had appeared likely to accept the Hamlin program, was dismayed to receive Plaintiffs' letter. It did not state what part of Nathan's plan they rejected, and she made numerous unsuccessful telephone calls to their home. On July 20, 1989, as she still had not reached them and because, she testified, the law placed a 30–day deadline upon the Defendant's provision of a hearing, she mailed them her form letter advising, as the law required, of the list of hearing officers developed by the Michigan Department of Education and suggesting the names of three from whom a mutually agreeable hearing officer might be chosen. Her letter further advised of available free or low cost legal and advocacy services and, finally, asked that they clarify exactly what portions of the IEP they found objectionable. Dr. Simpson appealed for a response because, as she wrote, "this information might not only expedite the hearing process but insure that the District has explored every reasonable option to resolve this matter prior to hearing."

Dr. Simpson continued her efforts to reach the Plaintiffs by telephone until around 9:30 p.m. the evening of July 24th, when she reached Mrs. Fischer who told her to talk with their attorney.

On July 24th and 25th, the Fischers had consulted their attorney. On the 27th, Mrs. Fischer and the attorney signed a Fee Agreement acknowledging the attorney's receipt of $1,700 against which monthly billing would be "at the rate of $100 per hour for attorney time and $30 per hour for expenditure of your opening advance." The agreement also states that:

> It is understood there is no reduction or rebate made in the event you decide to abandon, drop, or dismiss this action. However, if you have paid more money into the office than is expended, such money will be returned to you at the completion of all proceedings.

Also, on July 27th, the attorney wrote Dr. Simpson notifying her of her retention and requesting that she be contacted before Dr. Simpson makes necessary arrangements for the case. On that same date, the attorney called Dr. Simpson and they set a meeting date for August 3rd. Although the attorney suggested Dr. Simpson bring her attorney to that meeting, she did not.

On August 3, 1989, Drs. Simpson and White met with the Fischers and their attorney, and the Fischers brought with them a list enumerating exactly what support they requested as appropriate for Nathan if enrolled in his home school. The list clarified, for the first time, the fact that the Fischers were not requesting duplication of the Hamlin program at Musson. It requested, *inter alia*, aid for Nathan in the kindergarten room in calming, maintaining focus, and socialization; a quiet area to go for calming; speech, physical, and occupational therapies in several weekly sessions either before or after regular school; and the availability of a special education teacher's advice as a consultant to the regular teacher. At this meeting, Plaintiffs' attorney spent the afternoon insisting that the legal requirement of the least restrictive environment required placement in the home school, a principle which the educators disputed. The three-hour session concluded without consideration of the specifics of the parents' proposal.[2]

That evening, much disappointed by the confrontational nature of the afternoon

---

2. In *Barnett v. Fairfax County School Board,* 927 F.2d 146 (4th Cir.1991), The Fourth Circuit has held that the Act does not require a school Board to duplicate a highly specialized education program at a student's base school because the base school is a few miles closer to the student's home than the school at which the program is offered.

meeting, Dr. Simpson took the opportunity to study the written list which the Fischers had handed her at the meeting, realized that their desires could be met, and began to compose a letter which she sent them on August 7th. She expressed her disappointment at their "placing your attorney between us", restated the proposals of their list and the fact that the Fischers had stated that Nathan would not need the services of a special education teacher at his home school, and wrote: "If my understanding of what you want is correct, I think we at least have a basis for agreement." She asked for the opportunity to sit down with the Fischers, the Musson kindergarten teacher, and others, and discuss the possibility of meeting Nathan's needs with the addition of a paraprofessional in the Musson kindergarten room. This letter became the basis for the ultimate agreement between Plaintiffs and the school district.

On August 7th, Dr. Simpson also called the attorney and scheduled the suggested meeting for September 1st. On August 14th, the attorney wrote Dr. Simpson stating that her August 7th letter to the Fischers had been received in her office and that ... "Quite frankly, the tone ... was extremely accusatory and cause for *extreme* disappointment." She further stated, however, that "I believe we are in a settlement mode with regards to this matter. *Basically*, the terms of the settlement are contained in your August 7, 1989 letter to Mr. and Mrs. Fischer." However, "while most issues may indeed be resolved in short order, the issue of attorney's fees will have to be resolved as well." The attorney followed this with an August 24th letter to Dr. Simpson, enclosing a proposed Settlement Agreement based upon Dr. Simpson's August 7th letter and requesting that Dr. Simpson sign and return it. The attorney's agreement also included a provision that the Defendant reimburse the Fischers for attorney's fees, and Dr. Simpson did not sign it. She testified that the attorney's proposed agreement, moreover, did not include all of the benefits which the Defendant implemented for Nathan after a final meeting with his parents (without attorney) on September 1, 1989.

At the September 1st meeting, Nathan's final IEP for the school year was resolved. He was placed at Musson School in the general education kindergarten with the support of a paraprofessional and visiting therapists. A special education teacher was provided in consultancy only, and not in attendance teaching, as provided at the Hamlin program which had been agreed appropriate for Nathan at the June and July meetings. In short, the Hamlin program was not moved or duplicated for Nathan, and the matter was essentially resolved by provision of fewer services than initially offered to the student, as the price for enrollment in his neighborhood school. No hearing officer was ever selected or date set for hearing.

On September 6th, the attorney again wrote Dr. Simpson, enclosing a statement for her fees and advising that, "In the event you choose not to respond to this request for attorney's fees, I shall advise Mr. and Mrs. Fischer to file in Federal District Court for the attorney's fees." The attached statement was for 11.5 hours at $100.00 per hour and two hours at $50.00 per hour, for a total of $1,250. This lawsuit has ensued. No further evidence concerning the fees requested has been offered, although the parties have stipulated that $100.00 is a reasonable hourly fee. No evidence has been offered concerning fees demanded for prosecution of this lawsuit.

 The Handicapped Children's Protection Act provides, at 20 U.S.C. §§ 1415(e)(4)(B)–1415(e)(4)(F) (1986), in pertinent part that:

(B) In any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorney's fees ... to the parents ... of a handicapped child ... who is the prevailing party.

 . . . . .

(D) No award of attorneys' fees ... may be made ... subsequent to the time of a written offer of settlement to a parent ..., if—

(i) The offer is made ... in the case of an administrative proceeding, at any time more than ten days before the proceeding begins;

(ii) the offer is not accepted within ten days; and

(iii) ... the relief finally obtained by the parents ... is not more favorable to the parents ... than the offer of settlement.

. . . . .

(F) Whenever the court finds that—

(i) the parent ... during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy;

. . . . .

(iii) the time spent and legal services furnished were excessive considering the nature of the action or proceeding, the court shall reduce, accordingly, the amount of the attorneys' fees awarded....

In *Eggers v. Bullitt County School District*, 854 F.2d 892 (6th Cir.1988), the Court of Appeals of this Circuit has determined that the legislative history of the Handicapped Children's Protection Act, quoted above, authorizes a court to award fees to parents who have prevailed in proceedings to enforce the rights of handicapped children not only in the courts, but also at the administrative level. This Circuit is joined by four others which have reached the same conclusion; *Moore v. District of Columbia*, 907 F.2d 165 (D.C.Cir.1990); *McSomebodies v. Burlingame Elementary School*, 897 F.2d 974 (9th Cir.1989); *Mitten v. Muscogee County School District*, 877 F.2d 932 (11th Cir.1989), *cert. denied* 493 U.S. 1072, 110 S.Ct. 1117, 107 L.Ed.2d 1024 (1990); *Duane M. v. Orleans Parish School Bd.*, 861 F.2d 115 (5th Cir.1988).

In this case, however, the court is presented with a petition for fees from parents claiming to have prevailed in a dispute with their school district which was settled prior even to the selection of a hearing officer. Such a case does not appear to have been presented in our Circuit, to date. Under such circumstances, al-

though this Court finds that Congressional intent and the fulfillment of the purposes of the statute require that fees be authorized, the very brevity of the time span in which this "dispute", if such it was, was born and laid to rest requires the court to exercise extreme care in parsing the factual standards required by the statute quoted above to be applied.

Although this Circuit has not yet considered the claim of parents for fees when settlement is reached prior to administrative hearing, others have. In *Barlow–Gresham Union High School v. Mitchell*, 940 F.2d 1280 (9th Cir.1991), the court found parents entitled to recover such fees. However, the parents in that case, who had been sued by the school district Plaintiff for injunctive relief prior to the administrative hearing, were required to participate in an extensive evidentiary hearing in federal court on the question of whether their son presented a substantial danger to other students. The parents filed an answer and counterclaim for injunctive relief themselves, and ultimately reached a settlement only after the administrative hearing had convened three months later and been adjourned for the settlement discussions which produced a resolution. Those parents were found to have prevailed, because they had succeeded in changing an exclusion from school to a placement in a newly created program at the school with two other students. Clearly, those parents had prevailed, by any standard, in bettering their son's pre-litigation status, and the school district had precipitated them into litigation before they could even resort to administrative remedies.

The Fifth Circuit Court of Appeals, in *Angela L. v. Pasadena Independent School District*, 918 F.2d 1188 (5th Cir. 1990), awarded fees to parents who had entered into a settlement agreement negotiated by counsel for both sides at a prehearing conference conducted by the state-appointed hearing officer after the state had set the hearing date for the due process hearing that the parents demanded. The school district had initially rejected the parents' contention that Angela's mental retardation qualified as a handicap and re-

fused to provide the special education services, including individualized instruction and special therapy, which they had requested. Angela had failed all her courses, been retained in the first grade, and been diagnosed as mildly retarded by an outside pediatric development center. By the terms of the settlement, the school district granted almost all services requested by the parents, although it still declined to classify Angela as retarded. The Fifth Circuit closely examined the question of whether the parents had statutorily "prevailed". It wrote that the legislative history of the HCPA directs that the term "prevailing party" be given the same meaning as similar terms in other fee-shifting statutes. H.R.Rep. No. 296, 99th Cong., 2d Sess. 5–6 (1985); S.Rep. No. 112, 99th Cong., 2d Sess. 13–14 (1985) U.S.Code Cong. & Admin.News 1986, pp. 1798, 1803, 1804; and cited its prior ruling in *Shelly C. v. Venus Indep. School District*, 878 F.2d 862 (5th Cir.1989), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990). The *Angela L.* court continued:

> The United States Supreme Court has determined that the term prevailing under 42 U.S.C. § 1988 (attorneys fees in civil rights litigation) designates a party who has succeeded on any significant issue in litigation which achieves some of the benefit the party sought in bringing the action. See *Texas State Teachers Ass'n. v. Garland School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 366 (1989); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).... The remedy the Plaintiff receives, however, must be legally relevant, even if not factually substantial. A Plaintiff is not a prevailing party unless the resolution of the dispute alters the legal relationship of the parties "in a manner which Congress sought to promote in the fee statute." [Citing *Texas State Teachers, supra*] 918 F.2d 1188 at 1193.

The Court found that Angela L.'s parents had prevailed in altering the legal relationship of the parties in obtaining for Angela an otherwise denied fee and appropriate education, thereby fostering the purposes of the HCPA.

In the case of *Shelly C. v. Venus Independent School District*, cited *supra*, the Fifth Circuit had previously held that attorneys' fees are recoverable when a settlement is reached prior to administration hearing, but had remanded that case for resolution of issues of fact as to the reasonableness of the fees, whether the attorney had unnecessarily protracted the proceedings, and whether Plaintiffs had unreasonably rejected a settlement offer made more than ten days prior to the scheduled hearing.

The circumstances of the *Barlow–Gresham* case, *supra*, and of *Angela L., supra*, make it abundantly clear that the Congressional purpose in enacting this statute, of enabling parents to enforce the right of their handicapped child to a free and appropriate education, requires that fees be made available to parents who prevail in their efforts prior to the administrative hearing. This court must, therefore, move to an examination of the question of whether or not the Fischers were prevailing parties, within the meaning of the above-quoted HCPA, 20 U.S.C. 1415(e)(4)(B) (1986), and it finds that they were not.

It must be recalled that, although Plaintiffs succeeded in the enrollment of Nathan at their neighborhood school, Musson, it was at the sacrifice of the integrated program at Hamlin which was team-taught by special and regular education teachers, with the support of occupational, physical, and speech therapists as well as paraprofessionals. All parties had agreed, from the start, that the integrated program would best meet Nathan's needs. At Musson, Nathan was taught by a regular education teacher who was to consult with a special education teacher who was neither in the classroom, nor stationed at that school. The therapists would meet with Nathan for several 20–minute and one 40–minute sessions weekly before and after school. The only change made in the Musson kindergarten program for Nathan was, in short, the addition of a paraprofessional. Moreover, the Fischers had not initially

taken the position that this was their desire for Nathan. The court credits the testimony of the Defendant's participants in the June and July meetings that the Fischers wanted all of the services of the Hamlin program, but wanted those services moved or duplicated at Musson. It was not until they brought their list to the August 3rd meeting that they conveyed, in any manner, the idea that less than an entire program would be satisfactory. The court finds that this list was a concession from their initial position, which their attorney did all in her power to obfuscate. It was not until after that meeting, when Dr. Simpson was removed from the attorney's demands that Nathan had a legal right to all appropriate services at his home school, that Dr. Simpson realized that there was no dispute at all. From that day forward, the problem has been one of attorney's fees. When Dr. Simpson wrote her offer of settlement of August 7th, the response from Plaintiffs' attorney was that the merits may be resolved but fees must be, as well. The attorney then drafted a settlement agreement which paraphrased the parents' list, Dr. Simpson's offer, and provided for attorney fees, but omitted some of the benefits which were in fact obtained for Nathan in simple discussion between the parents and the Defendant. The plan ultimately settled upon for Nathan was far less than the plan all concerned had initially agreed was appropriate to his needs, but it was at his neighborhood school.

If Nathan's attorney had pursued the parents' initial insistence upon duplication of the Hamlin program at Musson and her legal argument that the child was entitled to all appropriate services at the home school, we are taught by *Barnett v. Fairfax County School Board, supra,* that the demand would have failed. There is no such entitlement. The Fourth Circuit even noted this attorney's argument that the Act does indeed require that a child be placed in "the least restrictive environment," 34 C.F.R. § 300.552(d) (1991), but held that "we do not interpret this section as imposing upon a school board an absolute obligation to place a child in his base school." *Id.,* at 153. The court noted that

the student, in that case, was being given the benefit of mainstreaming, the opportunity to socialize with non-handicapped children, as well as all appropriate services in the program offered him at a centralized location which was not his base school, and he had no such entitlement.

Accordingly, the success which Plaintiffs obtained in this matter was not an alteration of the legal relationship of the parties "in a manner which Congress sought to promote in the fee statute", *Angela L., supra,* quoting *Texas State Teachers, supra.* Their child has ended with less special education than the Defendant originally offered, not more. The relief finally obtained by these parents is not more favorable to the parents than the offer of settlement, whether that is construed as the first plan offered or the offer made by Dr. Simpson after the August 3rd meeting, which had been thwarted by the attorney's arguments.

Moreover, it appears to the court that the attorney for whom these fees are claimed caused the parents unreasonably to protract "the final resolution of the controversy" and that her "time spent and legal services furnished were excessive considering ..." the nature of the differences between these parties, to paraphrase the language of 20 U.S.C. § 1415(e)(4)(F) (1986). In *Hyden v. Bd. of Education of Wilson County,* 714 F.Supp. 290, 293 (M.D.Tenn. 1989), Judge Higgins stated that:

> The record as a whole makes it hard for the court to avoid the conclusion that this matter was contested at the administrative level largely because plaintiff's counsel was spoiling for a fight.

Unfortunately, this court is compelled to reach the same conclusion. Plaintiffs' attorney did not improve the position of either Nathan or his parents, in any manner intended by the Congress in enacting this legislation. Moreover, the attorney unnecessarily aggrandized and protracted the misunderstanding between the parties.

Finally, the record in the case is utterly barren of evidence concerning exactly what legal services were rendered for the 13.5

hours billed, aside from attendance at the three-hour meeting of August 3rd, 1989. There is also a dearth of evidence as to the time billed and fees claimed in prosecution of this lawsuit. It appears to the court that the purposes of the Handicapped Children's Protection Act have not been served by the attorney's activities, and the court therefore finds, in its discretion, that an award of attorney's fees is not appropriate.

Plaintiffs' action is accordingly dismissed with prejudice.

IT IS SO ORDERED.