**Emily HUDSON, By and Through her parent, Sharon HUDSON, Plaintiff,**

v.

**BLOOMFIELD HILLS PUBLIC SCHOOLS, Defendant.**

No. 94–CV–74636–DT.

United States District Court, E.D. Michigan, Southern Division.

Nov. 30, 1995.

1292

Stewart R. Hakola, Marquette, Michigan, for plaintiff.

John L. Gierak, Troy, Michigan and Robert A. Lusk, Detroit, Michigan, for defendant.

*OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. *INTRODUCTION*

This action, brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), is presently before the Court on cross-motions for summary judgment. The parties have submitted extensive briefs in support of their respective positions and oral arguments were heard on November 9, 1995. Having reviewed and considered the parties' briefs and oral arguments, and having further reviewed and considered the ten-volume record of the administrative proceedings held in this matter, the Court is now prepared to rule on the summary judgment motions. This Opinion and Order sets forth that ruling.

## II. *FACTUAL BACKGROUND*

Sharon Hudson, the mother of Plaintiff Emily Hudson, has brought this action appealing the decisions rendered in the administrative proceedings concerning the educational placement of her mentally-impaired daughter.

Emily Hudson is a developmentally disabled 14–year–old special education student certified as "trainable mentally impaired" ("TMI").[1] She has an IQ of 42 and tested on her April 1994 Achievement Test on a first-grade level in reading, math and spelling. [See *School District Admin. Hrg.* Ex. 2.]

Emily has been receiving special education services since 1985 when she was evaluated as a pre-schooler and placed in an Early Development program. In 1988 she was designated as "trainable mentally impaired" and was enrolled in Oakland County's TMI program in Pontiac, Michigan. She remained in that placement through 1991. [See Local Hearing Officer's Decision, p. 1.][2]

An "individualized education planning committee" ("IEPC") meeting was conducted in May 1991. That IEPC reconfirmed Emily's TMI status and recommended her placement in a cross-categorical basic special education classroom[3] in the Rogers Elementary School in the Bloomfield Hills School District. She spent approximately 5½ hours per day in the basic special ed classroom; the remaining time (1 to 1 and ½ hours per day) she was "mainstreamed" with the general education students.

The Bloomfield Hills School District services a student population of approximately 5600 students of whom approximately 656 are certified for special education services. The District has two high schools, three middle schools, and six elementary schools. There are currently four special education

---

1. Mentally impaired children are classified for special education purposes in Michigan according to the severity of their mental impairments. In degrees of severity, the most severe mental handicap is the "severely mentally impaired" ("SMI") classification. The next most severe impairment level is the "trainable mentally impaired" ("TMI") classification. The third classification is the "educable mentally impaired" ("EMI"). *See* Mich.Admin.Code R340.1703–1705 (1980).

2. The Local Hearing Officer who conducted the five-day local administrative hearing and issued the first-level administrative decision is referred to in this Opinion as the "LHO". The subsequent state-level administrative appeal hearing officer is referred to as the "SHO".

3. A "cross-categorical" classroom services special education students with various disabilities.

basic classrooms in the district: one pre-school basic classroom, two elementary basic classrooms and one middle school basic class-room. The middle school basic classroom is located at West Hills Middle School. It is called the "Learning Center."

In May 1993, when Emily reached the chronological age of a middle school student, an IEPC was held to consider a change in Emily's placement to a middle school setting.

The Committee recommended a middle school placement continuing with a split in Emily's school day, i.e., that she spend ap-proximately three hours per day in a cross-categorical basic special education classroom, with the remaining time of the school day to be spent mainstreamed in the general edu-cation program. The School District wanted Emily placed in West Hills Middle School all day. Mrs. Hudson disagreed with that rec-ommendation. She wanted Emily placed at East Hills Middle School (the middle school that she would attend if she were in regular education) all day,[4] and asked for a "due process hearing" pursuant to Section 1415(b) of IDEA and Mich.Admin.Code R340.1722a (1987) to contest the District's recommenda-tion.

The parties, however, avoided a hearing by agreeing to a "trial placement" for the 1993–94 school year whereby Emily would "split" her time between West and East Hills. She

was to spend 2¼ hours in the West Hills basic special education classroom, then she would take a ten-minute bus ride to East Hills where she would have lunch with the general education students and spend the afternoon in the regular sixth grade science/social stud-ies, gym and art classes with a paraprofes-sional aide to assist her while she worked on her own work (as opposed to the sixth grade work the general ed students were doing), a concept known as "parallel instruction."[5]

By the end of the 1993–94 school year, this "trial placement" proved unsatisfactory to all parties. An IEPC was conducted in April 1994. The Committee once again recom-mended full-time placement at West Hills for Emily where she would spend approximately 3–4 hours a day in the Learning Center (i.e., the special education basic classroom) and the remaining time in regular education gym, art, home economics, drama and music classes ("unified arts") at West Hills. Pri-mary emphasis for the completion of aca-demic goals would be placed in the basic special ed classroom program. Mrs. Hudson did not agree with the April 1994 IEPC. It was (and still is) her position that Emily should attend East Hills for the entire school day and should be placed primarily in regu-lar education classes, but could be "pulled out" of regular education 1–2 hours a day for intensive individual instruction in the Student Center.[6]

---

4. East Hills does not have a basic special edu-cation classroom.

5. For example, when the regular social studies students were studying Latin America, Emily would be given first or second grade level color-ing book-type worksheets of Mexico to work on.

6. As noted above, East Hills does not have a basic special education classroom like the Learn-ing Center in West Hills. According to the testi-mony of Sharon DiRezee, the East Hills Student Center coordinator, the Student Center is not a special ed classroom; rather it is a resource center used by the entire East Hills student body and faculty, not just special education. For ex-ample, in addition to special education, the Cen-ter is utilized by gifted and talented students, bilingual education students, and at-risk stu-dents. Ms. DiReeze stated that over the course of a school day, 30 to 75 students utilize the center. It is essentially an enrichment center used for numerous activities such as hosting a "science olympiad" for the school, or for con-

ducting computer-simulated activities. The Stu-dent Center is staffed by three teachers and two paraprofessionals. Two of the teachers are certi-fied in special education. Also, one of the para-professionals who works half-time is a special education aide. Ms. DiReeze testified that the staff does not "pull out" special ed students for instruction; rather they go into the regular ed classrooms and work with the special needs stu-dents in their regular classes. It appears that the East Hills special ed students are principally learning disabled ("LD") students (e.g., students diagnosed with dyslexia, developmental aphasia, or minimal brain dysfunction), not mentally im-paired students. However, because Bloomfield Hills does have a small population of mentally impaired middle-school-aged students whose needs cannot be met in the Student Center con-cept, the District created a basic special edu-cation classroom at one middle school, West Hills. When that basic program was established, the entire general education staff of West Hills went through extensive training so that main-streaming of these students could be maximized. [See Hrg.Tr. Vol. I, pp. 13–14.]

It is Mrs. Hudson's disagreement with the April 1994 IEPC that precipitated the administrative proceedings and this judicial review of the administrative hearing officers' decisions. Meanwhile, during the pendency of the administrative proceedings and this judicial action, pursuant to 20 U.S.C. § 1415(e)(3), Emily has remained in the West Hills–East Hills split day placement pursuant to the 1993 IEPC "trial placement".[7]

*The Administrative Proceedings*

Pursuant to Mrs. Hudson's request, a special education due process hearing was held at the West Hills Middle School over a five-day period in May 1994.[8] Frank J. Wawrzaszek was mutually selected as the hearing officer for this local hearing.

Prior to the commencement of the hearing, pursuant to *Doe v. Defendant No. 1*, 898 F.2d 1186 (6th Cir.1990) and *Cordrey v. Euckert*, 917 F.2d 1460 (6th Cir.1990), the hearing officer assigned the burden of proof to Plaintiff to establish that the IEPC's placement of Emily was inappropriate.

Over the course of five days, the hearing officer heard the testimony of Beth Mueller, Emily's special education basic classroom teacher in the Learning Center at West Hills Middle School; Sharon DiReeze, the Student Center coordinator at East Hills Middle School; Janet Tack, the paraprofessional who worked one-on-one with Emily while she attended regular education science and social studies classes at East Hills; Janette Gwinn, the Principal of West Hills Middle School; Donald Hillman, the Principal of East Hills Middle School; Dr. William Filiatreau, Bloomfield Hills' Director of Special Education; Wendy Lane, the school social worker at West Hills; Jeffrey Holbrook, a general education at-risk resource teacher with the Bloomfield Hills Schools; Timothy Kelly,

Emily's softball coach; Sharon Hudson, Emily's mother; Emily Hudson; Dr. Gerald Freeman, Ph.D., a Human Development and Child Studies professor at Oakland University who testified as an expert in special education placement on behalf of the School District; and Thomas Osbeck of the Wayne State University Developmental Disabilities Institute and Dr. David Winstrom, Ph.D., a psychologist with Lakeshore Therapeutic Services, who testified as experts on behalf of Plaintiff. The LHO also received into evidence numerous exhibits.

Beth Mueller, the teacher of the cross-categorical special education basic classroom at West Hills Middle School testified that while West Hills and East Hills have Student Center resource rooms that service bilingual students, gifted and talented and LD special education students, only West Hills has a special education basic classroom. That basic classroom services the entire school district, not just those more severely handicapped students who live in the geographic vicinity of West Hills.

Ms. Mueller testified that she has 12 students in the basic classroom: one autistic student, three who are physically impaired ("POHI"), four who are educably mentally impaired, and four who are trainably mentally impaired. She stated that the severity of Emily's disability placed her in the lowest quarter of her class.

Ms. Mueller is assisted in her classroom by one full-time and one half-time paraprofessional. Other professional staff that assist her are "ancillary service" providers: a physical therapist, an occupational therapist, a speech and language therapist, and a social worker. She is also assisted by an autistic consultant and a hearing consultant because

---

**7.** 20 U.S.C. § 1415(e)(3) provides, in pertinent part:

> During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child ... until all such proceedings have been completed.

**8.** Section 1415(b)(2) provides that if the parents or guardian of a handicapped child disagree with the child's educational placement,

> ... the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency.

Mich.Admin.Code R340.1724 (1987) provides for a local hearing.

one of her students also has a hearing impairment. There are also two general education staff members at West Hills who have mental impairment certification, one teacher and one counselor. They are involved in the planning of mainstreaming of the students.

Ms. Mueller explained that her classroom is designed to meet the specific needs and goals set by the IEPCs of her 12 students. The classroom is equipped with ovens, kitchen tools, manipulatives, and textbooks and other materials from the lower grades that allow mentally impaired students to work toward their goals in a concrete manner.

With respect to Emily, goals set by her IEPC included not only improvement of academic performance but also development of some independent living skills (e.g., washing dishes, cooking, etc.). Among the specific goals of Emily's IEPC was for Emily to learn to tell time to the nearest five minutes, learning to match money equivalents and coin values, and learning to understand when to add, subtract or multiply.

Ms. Mueller testified that while Emily could tell time to the hour and half-hour, and thus may be able to tell that it is 10:00 a.m., she could not associate that fact with the need to go somewhere or do something at 10:00 a.m. With respect to coin values, Ms. Mueller explained that Emily could not add the value of different coins. For example, if she started counting with a dime, she would give all coins the value of ten cents, regardless of whether they were dimes, nickels, quarters or pennies.

Both Ms. Mueller and Sharon DiReeze, the Student Center resource room coordinator at East Hills Middle School, testified that Emily's ability to express herself in writing was very basic. Emily could write her name, address and phone number; although she could not accurately respond to questions about her address, such as "What State do you live in?" She could not accurately copy information from the blackboard or from a worksheet she was working on. She could not accurately write what her teacher dictated. Thus, among the goals and objectives set by the IEPC was for Emily to learn to

dictate into a tape recorder and learning to keyboard ideas into a computer to complete a simple sentence.

The IEPC also noted that Emily did not demonstrate age appropriate conversational skills and had difficulty with peer relationships. Both Ms. Mueller and Ms. DiReeze testified that Emily had a very limited ability to communicate and the communication skills she did exhibit were often maladaptive. For example, when Emily wants someone's attention, she circles around them repeatedly without speaking, or bumps into the person whose attention she wants. She also greets others with the stock phrase, "I like your shirt." The IEP addressed these deficits by setting goals and objectives including: learning to gain attention in the proper way; learning to initiate and respond to conversations with other students; learning to ask for help; and learning to respect others' personal space.

Ms. DiReeze and Janet Tack, the paraprofessional who worked with Emily one-on-one in her mainstreamed East Hills classes,[9] testified that Emily was simply incapable of benefitting from middle school instruction. Because of her mental impairment, she could not do middle school math, reading or science. Just the language used in classes at the 6th, 7th, 8th grade levels is beyond Emily's comprehension.

With respect to social and emotional goals, Ms. DiReeze and Ms. Tack both testified that Emily made little or no progress toward these goals at East Hills. They, in fact, testified that the East Hills placement may be doing more harm than good because the only person that Emily really would talk to was Ms. Tack since she was the one who worked with her every day. When the staff agreed that an attempt should be made to put a little distance between Ms. Tack and Emily, Emily would rebel by slamming her book shut or by fidgeting with the pages to draw Tack's attention.

Dr. Gerald Freeman, a special education professor at Oakland University and former Director of Special Education of the Oakland

9. Although she is working in the Bloomfield Hills schools as a part-time paraprofessional, Ms. Tack is a certified teacher.

County Intermediate School District, also testified concerning his opinion about Emily's educational placement. Prior to the local hearing, Dr. Freeman spent several days observing Emily in her split East Hills/West Hills program. He also spoke with her teachers and paraprofessionals and reviewed school records.

Dr. Freeman's opinion was that

... from an educational standpoint, the overriding objective with Emily should be to attempt to enable her to be as independent a young woman as she possibly can be, and [therefore] her curriculum should reflect heavily on the development of those skills which will lead to such independence.

Now, I'm concerned about her being capable of taking care of herself, her being capable of taking care of her environment, her being capable of knowing how to be safe, her ability to get around a community, to engage in what special education generally is called activities of daily living, those kinds of things.

[Hrg. Tr. Vol. III, pp. 547–48.]

Dr. Freeman testified that Emily was developing these "independent living" skills in Ms. Mueller's basic class. He further testified that Emily was not developing these skills or otherwise benefiting academically from her placement in the regular education academic classes at East Hills because the subject matter was far beyond her intellectual ability. "There's such a big gap curricularly," he explained. [Hrg. Tr. Vol. III, p. 614.] He elaborated:

My main concern is that in observing her [at East Hills], I could not derive what benefits, educationally she was deriving from being placed in that situation.

I saw a lack of involvement in the activities, an isolation within a regular classroom, basically, and I kept asking myself the question, what is this child supposed to be getting out of this situation, ... why isn't this child's time being used in ways that would, to my way of thinking, leave more to what an educational program for her should be.

[Hrg. Tr. Vol. III, pp. 607–608.]

Emily's mother, Sharon Hudson, however, testified that she wanted Emily in regular 7th grade academic classes, and not in the special education basic classroom, at all. She testified that she believed that the independent living goals in Emily's IEPC were inappropriate. When asked by the Hearing Officer what kind of program she wanted for Emily she stated:

What kind of program [I want] is an academic based program. I don't find that—I think that a lot of the goals we wrote into Emily's IEPC are very appropriate kinds of goals, but I don't think they should take place without being firmly rooted in academic, and I don't think it's fair to pull the plug on Emily's future by saying that it's not appropriate for her to have science and social studies and composition and all those kinds of things that might be typical for a seventh grade student.

I think none of us knows the extent to which Emily can achieve, and I think it is patently unfair to say that she doesn't need that kind of stuff because she's only going to be doing something menial, and therefore we should concentrate on preparing her for existing in a menial world. That's not how I see the value of education for Emily.

I want her to have seventh grade subjects ... and, I'd like her placement to be in her neighborhood school with the kids she lives with, plays with, goes to church with.

[Hrg. Tr. Vol. IV, pp. 842–843.]

The LHO voiced his concern about an "osmosis" method of Emily "picking up" what bits and pieces she's capable of understanding from a general education placement such as Mrs. Hudson's preferred placement:

[O]f course, we're only talking about next year, we're talking about seventh grade, maybe this is absurd, but does she go to a calculus class, does she go to other [classes] just to pick up whatever is related or understood by her in that class.

These are things that bother me, because as I pointed out to Mr. Hakola ... the education law calls for development in the cognitive, the affective, the psychomotor and other areas besides socialization, and that's one of the things that I need to be convinced about. I need to be con-

vinced that the education law is used to provide education per se and in a method other than osmosis, just pick anything up that you're capable of picking up....

\* \* \* \* \* \*

[A]s a person who has to make a decision on an educational program and the appropriateness of an IEPC, I need to know those kinds of things, because very frankly, I don't think that, just to put a person in a classroom without specific information geared to her intellect, reading ability and so forth, and as I looked at the records, it was, what, 1.6 reading level ... but what happens when you get to a higher level and when you get to grades that are junior high and high school grades, where basic subjects are no longer taught, when you're no longer dealing with the basics of math or things of that kind?

[Hrg. Tr. Vol. IV, pp. 845–46.]

Although Mrs. Hudson acknowledged that a calculus "probably would not be the kind of math she's going to be needing to do in her life," she still resisted,

... I feel like Emily is penalized to some extent by the unwillingness of individuals to kind of push her as far as she could go....

Emily has a very inquiring mind.... I don't know any reason why we should not encourage and push [her] interests and desires just as far as they can possibly be carried out.

[Hrg. Tr. Vol. IV, pp. 846–47.]

Mr. Osbeck of the Developmental Disabilities Institute testified on behalf of Plaintiff in support of Mrs. Hudson's preference for placement of Emily in the general education program at East Hills. However, when asked if he had ever recommended that a developmentally disabled student not be placed in a regular education class with the regular education teacher being responsible for the student's education, he stated, "In the cases that I testified, I don't recall any time that I've recommended against it." [Hrg. Tr. Vol. V, p. 972.]

Dr. David Winstrom, a neuropsychologist, also testified in support of Mrs. Hudson's position. His testimony was based upon a 20–minute observation of Emily at West Hills, a visit to the East Hills regular classes, and neuropsychological testing of Emily that he performed at the Hudson's home. Although he stated that he felt Emily should be educated in her "home school", he admitted that he is not trained as a school psychologist and is not certified to serve in that capacity. [Hrg. Tr. Vol. V, p. 1067.]

Neither Dr. Winston nor Mr. Osbeck disputed the facts to which the School District's witnesses testified.

After hearing the testimony of all of the witnesses and receiving fifty lengthy exhibits into evidence, including records of testing of Emily and copies of the work she had done while in the split West Hills/East Hills placement, the LHO permitted the parties to submit post-hearing briefs. Two months later, on July 27, 1994, the LHO issued his 13–page findings and decision.

■ The LHO noted that while Emily has many positive social characteristics, "she has cognitive limitations which call for a level of special education assistance not currently available at EHMS." He found that the Plaintiff did not meet the burden of establishing that the placement of Emily in West Hills full-time pursuant to the April 1994 IEPC was inappropriate. [LHO Decision, p 10.] He explained:

There has not been a single witness who has provided convincing evidence in support of petitioner's position that a program in the home school (EHMS) with increased involvement in regular education 7th grade academic classes and decreased placement in special education services, will meet Emily's current educational needs.

In contrast, respondent BHPS district counsel has presented witnesses who have worked with Emily and have observed her progress and problems for a full year. District witnesses have worked in both settings. They have shown that Emily's specific goals and objectives need to be addressed in a combination of basic classroom/appropriate regular class placement. LHO believes that the preponderance of evidence supports full-time placement at WHMS.

\* \* \* \* \* \*

The record shows that the BHPS are committed to the inclusion of handicapped students in regular education. Dr. Filiatreau has testified that 95% of the 656 BHPS "handicapped" students are mainstreamed to the degree appropriate for their ability. Even with Emily's academic shortcomings, her proposed participation in regular education is still approximately one-half of each school day. The record has repeatedly shown that Emily could not participate in regular education, take similar tests and achieve at a level comparable to other 7th grade students.... During the trial placement Emily was provided with a personal aide who presented a parallel instructional program. The materials were different, the tests were different and Emily's achievement in academics was minimal, at best.

In the opinion of the LHO, short of adding a [special education basic classroom] Learning Center for Emily at EHMS, no amount of supplementary aides and services would meet Emily's current needs. The costs involved in the replication of programs solely for placing Emily in her home school cannot be justified.[10]

[LHO Decision, pp. 10–12.]

Thus, the LHO determined:

In the opinion of the hearing officer, the most appropriate public education for Emily Hudson can be provided at the West Hills Middle School. The availability of the basic classroom and the potential for improved coordination of services while Emily is in a regular classroom favors the WHMS placement. The LHO does not believe that a continued involvement in a two school setting can be supported or justified.

[LHO Decision, p. 3.]

Mrs. Hudson was not satisfied with the findings and decision of the local hearing officer and, therefore, pursuant to 20 U.S.C. § 1415(c) and Mich.Admin.Code R340.1725, appealed to the Michigan State Department of Education.[11] Dr. William Sosnowsky was appointed the State-level hearing officer ("SHO"). The issues raised on appeal were (1) whether the LHO had correctly placed the burden of proof of inappropriateness of Emily's placement on Mrs. Hudson, and (2) whether the April 1994 IEP was appropriate for Emily.

The State hearing officer's decision reveals that he reviewed and considered all of the evidence presented in the local hearing, and after completing that review, on September

10. Dr. Filiatreau has submitted to the Court an Affidavit in support of the School District's position stating that it would cost approximately $35,000 to replicate the services available at West Hills at East Hills. [See Affidavit attached to Defendant's Summary Judgment Brief.] Plaintiff contends that the Court should not consider this Affidavit since it was not submitted in the Administrative Proceedings. Plaintiff is mistaken. IDEA's appeal provisions, in fact, explicitly provide for the Court to receive additional evidence. See 20 U.S.C. § 1415(e)(2). The Sixth Circuit has construed Section 1415's "additional evidence clause" as vesting discretion in the district court to determine under the facts of each case whether additional evidence is warranted. See Nashville and Davidson County Metropolitan Government v. Cook, 915 F.2d 232, 234–235 (6th Cir.1990).

11. 20 U.S.C. § 1415(c) provides:

If the [due process] hearing ... is conducted by a local educational agency ..., any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an in-

dependent decision upon completion of said review.

Mich.Admin.Code R340.1725 provides, in pertinent part:

(1) Any party who is aggrieved by the findings and the decision of a hearing conducted pursuant to the provisions of R340.1724 may appeal to the department within 25 calendar days of receipt of the decision for a state review....

(2) If there is an appeal, the department shall conduct an impartial review of the hearing. The official who conducts the review shall do all of the following:

(a) Examine the entire hearing record, which shall be provided to the state by the public agency in written verbatim form.

(b) Ensure that the procedures at the hearing were consistent with the requirements of due process.

(c) Seek additional evidence if necessary....

(d) Afford the parties an opportunity for oral or written argument, or both, at the discretion of the reviewing official.

(e) Make an independent decision on completion of the review. The reviewing officer may affirm, reverse, or modify the decision of the hearing officer or may remand the matter to the hearing officer for further proceedings....

13, 1994, he affirmed the LHO's decision in all respects.

With respect to the "burden of proof" issue, the SHO found that the burden of proof was properly assigned to Mrs. Hudson because she "challenged the IEP, and requested a hearing before the IEP was completed" and because he found that the school district had complied "directly and by presumption, with all procedural requirements that sufficiently enabled [Mrs. Hudson] involvement and participation [in the IEP.]" He further noted that "[a]ll information was actually known to the parties." [See SHO Decision, p. 4.]

The SHO also found in favor of the school district on the second appeal issue, i.e., whether the IEP, upheld by the LHO, was appropriate to meet Emily Hudson's needs. The SHO explained:

1. All of Emily's teachers, and her assisting paraprofessional support her placement in a basic classroom setting.

2. The extremely limited educational development, nominal at best, made by Emily is attained only by the confluence of radical, concrete and repetitive, intervention of her basic classroom instruction, constant and complete supervision, direction, and assistance by a paraprofessional, social work, a protective barrier of a "circle of friends", a skillfully and carefully planned parallel curriculum that only vaguely resembles that of her regular grade classmates.

3. Emily is totally dependent upon all of the above resources, and essentially has none of her own that can be developed other than by intensive training. Thus, the importance of the learning center (basic classroom): a full-time special education teacher, a half-time paraprofessional aide, special aids, materials, and equipment, all facilitative to the concrete methods and techniques that are most appropriate to Emily's unique needs. . . .

(4) She remains naively responsive and vulnerable to a certain segment of unscrupulous classmates who tease, taunt, and ridicule her. Mr. Osbeck's description of Emily is most fitting: ". . . an island in the mainstream." . . .

(5) She is disruptive to others and distractible to herself. The assigned paraprofes-

sional, nearly always in close proximity to Emily, attenuates, but cannot extinguish, these behaviors. Both of these general behaviors would best be accommodated and modifiable in the proposed basic classroom.

6. Emily is nearly 13-years-old with a mental age of 5-years-and-4-months. A regular 7th grade comprises, in general, children 12-years of age, with, assuming only average IQs, mental ages of 12-years: A variance of about six years, or more graphically, a 1st grader in the 7th grade. Samples of her work confirm this portrayal.

[State Decision, p. 6.]

Thus, the SHO concluded,

1. EMILY HUDSON meets the definition of TRAINABLE MENTALLY IMPAIRED in accordance with Michigan administrative rule R340.1704. This finding is not disputed.

2. MISS HUDSON needs special education and related services. These are best accomplished in the West Hills Middle Schools in the Bloomfield Hills school district.

3. The extent of service required to meet her unique needs [is] specified in the IEP of 4–14–94 (as amended) and as otherwise specified in the decision of the LHO.

[State Decision, p. 7.]

Dissatisfied with the State official's decision affirming the LHO, Mrs. Hudson filed this lawsuit. The Complaint originally alleged four counts arising under IDEA (Counts I and III), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count II), and the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.* (Count IV). Plaintiff stipulated to the dismissal of Counts III and IV, leaving only Counts I and II for adjudication.

The parties have completed discovery. The School District deposed Plaintiff's expert, Thomas Osbeck, who testified at the due process hearing. Plaintiff deposed various School district teachers and staff members who also testified at the due process hearing. These witnesses did not modify

their previous testimony in any significant way.

### III. *DISCUSSION*

#### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Fed.R.Civ.Pro. 56(c) provides for entry of summary judgment if the record evidence on file shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Construing Rule 56(c), the U.S. Supreme Court explained:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Under the principles enunciated in the above trilogy, the movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). In responding to a summary judgment motion, the respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* Thus, the respondent must "do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. *Id.* The trial court has at least some discretion to determine whether the respondent's claim is plausible. *Id.* at 1480. *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

#### B. *APPLICABLE STANDARDS IN IDEA § 1415 ACTIONS*

(1) *Standard of Review to be Applied by the Court*

Subsection (e) of § 1415 of the IDEA provides, in pertinent part:

> In any action [challenging the administrative findings and decisions of the local and state agencies], the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2).

The Supreme Court has held that the provision that a reviewing court "bas[e] its decision on the preponderance of the evidence [and] grant such relief as the court determines is appropriate"

> is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.... The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.

*Board of Education v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982).

Based on *Rowley*, the Sixth Circuit has held that in IDEA cases, district courts are required to perform a *de novo* review, but must "give due weight to the state administrative proceedings in reaching its decision." *Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir.1982), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983). More recent cases describe this standard as a "modified *de novo* review." *See e.g., Doe v. Board of Education*, 9 F.3d 455, 458 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994).

■ As the court observed in *Doe v. Smith*, 879 F.2d 1340 (6th Cir.1989), this deferential standard of review makes sense because "federal courts are generalists with no experience in the educational needs of handicapped children and will benefit from the fact finding of a state agency with expertise in the field." *Id.* at 1343. *See also, Thomas v. Cincinnati Board of Education*, 918 F.2d 618, 624 (6th Cir.1990). Failure of a district court to give the state proceedings due weight constitutes reversible error. *See Gillette v. Fairland Board of Education*, 932 F.2d 551, 555 (6th Cir.1991).

*(2) Burden of Proof*

■ The burden of proof in an appeal from a disputed IEP falls on the party challenging the IEP. *Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir.1990). *See also, Doe v. Board of Education of Tullahoma City Schools*, 9 F.3d 455, 458 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994); *Doe v. Defendant I*, 898 F.2d 1186, 1191 (6th Cir.1990). Thus, in this case, Plaintiff bears the burden of proving that the disputed IEP placing Emily Hudson in West Hills Middle School all day is inappropriate.

C. *PLAINTIFF HAS NOT ESTAB-LISHED THAT THE CHALLENGED IEP IN THIS CASE IS INAPPROPRI-ATE*

Plaintiff claims that Emily Hudson's IEP is inappropriate because she contends that IDEA's "least restrictive environment" ("LRE") provisions require that Emily be placed at her "home school", i.e., the school she would attend if she were not handicapped. Since Emily would attend the middle school closest to her home if she were not handicapped and that closest school is East Hills Middle School, Plaintiff contends that the statute and attendant regulations mandate that she be placed in that school.

IDEA does not use the phrase "home school" or speak to the proximity of a placement to a child's home. Rather, the "least restrictive environment" provision states only that schools must establish procedures to assure that

to the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily....

20 U.S.C. § 1412(5)(B) (emphasis added).

IDEA's regulations interpreting Section 1412(5)(B) do use the word "home", but not in the narrow sense argued by Plaintiff. 34 C.F.R. § 300.552 provides:

Each public agency shall ensure that:

(a) The educational placement of each child with a disability—

(1) Is determined at least annually;

(2) Is based on his or her IEP; and

(3) Is as close as possible to a child's home.

(b) The various alternative placements included at § 300.551 [instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions] are available to the extent necessary to implement the IEP for each child with a disability.

(c) *Unless the IEP of a child with a disability requires some other arrangement,* the child is educated in the school that he or she would attend if nondisabled.

(d) *In selecting the LRE [least restrictive environment], consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs.*

34 C.F.R. § 300.552 (emphasis added).

Moreover, the official Department of Education Note following this regulation makes clear that placements are not etched in stone, but rather are to be made based on each individual child's needs:

Section 300.552 includes some of the main factors that must be considered in determining the extent to which a child with a disability can be educated with children who are nondisabled. *The overriding rule in this section is that placement decisions must be made on an individual basis.*

The section also requires each agency to have various alternative placements available to ensure that each child with a disability receives an education which is appropriate to his or her individual needs.

As the Sixth Circuit observed in *Roncker, supra,* in a case involving the placement of child who, like Emily Hudson, had an IQ of less than 50 and was classified by as trainable mentally impaired, the proper focus in each case is the "benefit" to the handicapped child. Focusing on the benefit to the child, the *Roncker* court noted that mainstreamed education is not always appropriate for a handicapped child, and explained that mainstreaming would not be appropriate

if the disabled student would not benefit from the mainstreaming; or

if any marginal benefit from mainstreaming would be outweighed by the benefits gained from services that could not feasibly be provided in the non-segregated setting; or

if the disabled student would be a disruptive force in the mainstreamed setting.

700 F.2d at 1063.[12]

The *Roncker* "benefit-to-the-disabled-child" test has been adopted by the Fourth and Eighth Circuits. *See, A.W. v. Northwest R–1 School District,* 813 F.2d 158, 163 (1987), *cert. denied,* 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987); *Barnett v. Fairfax County School Board,* 927 F.2d 146 (4th Cir. 1991), *cert. denied,* 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991).[13]

In *Barnett, supra,* the parents of a handicapped child contested the child's IEP placement at a school that was, like Emily Hudson's West Hills placement, five miles farther from his home than his "home school". The Fourth Circuit rejected the parents' contention that 34 C.F.R. § 300.552 required placement at the child's "home school":

[W]e do not interpret this section [34 C.F.R. § 300.552] as imposing upon a school board the obligation to place a child in his base school. Rather, this section requires only that a school board take into account, as one factor, the geographical proximity of the placement in making these decisions....

927 F.2d at 153. *See also, Fischer v. Rochester Community Schools,* 780 F.Supp. 1142, 1150 (E.D.Mich.1991), in which the court noted the lack of merit in the plaintiff-parents argument that their handicapped child was entitled to all appropriate services at the "home school" explaining, "[W]e are taught by *Barnett v. Fairfax County School Board, supra,* that ... there is no such entitlement."

Similarly, in *Schuldt v. Mankato School District No. 77,* 937 F.2d 1357 (8th Cir.1991), *cert. denied,* 502 U.S. 1059, 112 S.Ct. 937, 117 L.Ed.2d 108 (1992), the Eighth Circuit stated:

The [plaintiffs] argue that the act [IDEA] requires the school district to place Erika at the school nearest to her home. Their argument misinterprets the act [and] misuses precedent....

We interpret section 300.552 as directing the school district to locate Erika at a school where her teachers can fully implement her program. The phrase "as close as possible" is not a mandate that the school district place Erika at [her home school.]

*Id.* at 1361.

Recently, the Tenth Circuit addressed this "home school" issue in *Murray v. Montrose County School District RE–1J,* 51 F.3d 921 (10th Cir.1995), a case which factually is strikingly similar to the instant action. *Murray* concerned a child with cerebral palsy who had initially attended his "home school". An IEPC was conducted and it was determined that the child would be more appropriately placed at another elementary school, which like West Hills Middle School in our case, had a specific program for severely disabled students. This school, however, was ten miles from the student's home. The child's parents requested a due process hear-

---

**12.** The *Roncker* court also determined that cost is another proper factor to consider in determining the appropriateness of a handicapped child's placement. *Id.*

**13.** Plaintiff does not dispute that the *Roncker* benefit analysis is the accepted test in this Circuit. Instead, relying on case law from the Third, Fifth and Eleventh Circuit criticizing *Roncker,* Plaintiff asks this Court to disregard Sixth Circuit precedent and adopt an alternative test focusing on whether the child can "achieve satisfactorily" in regular education with the assistance of supplementary aids and services.

**1304**

ing to contest the placement. At the hearing, they contended that the LRE provisions of IDEA required the school district to educate their child at his home school. The administrative proceedings were concluded in the school district's favor, and in the parents' subsequent appeal to the federal district court, the district court granted the school district's motion for summary judgment.

On appeal to the Tenth Circuit Court of Appeals, the Murrays argued, just as Plaintiff here argues, that the IDEA's LRE provisions and its regulations and legislative history gave rise to a strong presumption that the LRE was at the student's "neighborhood", i.e., "home" school. The Court of Appeals rejected that argument:

> The Murrays ... argue that the two implementing regulations make express what the statute merely implies. 34 C.F.R. § 300.552(a)(3) provides that "[t]he educational placement of each child with a disability [shall be] as close as possible to the child's home." 34 C.F.R. § 300,.552(c) provides that state agencies must ensure that "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled." The Murrays assert that these two regulations create a presumption that the LRE is in the neighborhood school.
>
> We disagree. A natural and logical reading of these two regulations is that a disabled child should be educated in the school he or she would attend if not disabled (i.e., the neighborhood school), unless the child's IEP requires placement elsewhere. If the IEP requires placement elsewhere, then, in deciding where the appropriate placement is, geographical proximity to home is relevant, and the child should be placed as close to home as possible.

*Id.* at 929.

■ This Court agrees with these interpretations of the IDEA statute and regulations. Contrary to Plaintiff's contentions, nothing in the statute or regulations *requires* a school district to in every instance place a child in the neighborhood school that he/she would attend if not handicapped. As the Tenth Circuit observed in *Murray,* a natural and logical reading of the statute and regula-

tions is that education in the neighborhood school is preferred *unless* the child's needs as identified in the IEP requires placement elsewhere. It is at the point where placement is required elsewhere that a school district must place the child in such an alternate placement "as close to home as possible." The Bloomfield Hills School District has complied with this requisite.

■ Emily Hudson's IEP requires placement in a Learning Center with mainstreaming in unified arts classes. Bloomfield Hills has only one special education "Learning Center" basic classroom and that basic classroom is at West Hills Middle School.

Plaintiff nonetheless argues that the Court should reverse the findings and conclusions of the State and local hearing officers and find that Emily's IEP requiring placing her in a special education basic classroom for any part of the day is inappropriate. She claims that Emily can "achieve satisfactorily" in all regular middle school academic subjects, and therefore should be placed full-time in the general education program—with "an hour or two" daily "intensive" assistance—rendering placement at East Hills appropriate. The preponderance of the evidence, however, does not support Mrs. Hudson's claim that Emily can "achieve satisfactorily" in regular education classes.

To accept Plaintiff's argument, the Court would have to ignore the extensive record of the administrative proceedings and the great weight of the evidence presented in those administrative proceedings establishing that Emily was not developing any needed independent living skills or otherwise benefiting academically from her placement in the regular education academic classes at East Hills because the subject matter was far beyond her intellectual ability.

All of Emily's teachers and paraprofessionals testified that Emily needed to be in the special education basic classroom. The evidence presented in the administrative proceedings established that Emily could not participate in regular education, take similar tests and achieve at a level comparable to other 7th grade students. During the "trial" East Hills half-day placement, Emily did not do seventh grade work. Nor did she participate in instruction with the regular seventh

grade classroom teacher or her classmates. Rather, she worked in isolation and was provided with a personal aide upon whom she became almost completely dependent, who presented to Emily a separate first- or second-grade level instructional program with materials that were completely different from those the regular seventh graders worked on. The tests Emily was given were different from the regular seventh graders and her achievement in academics—even at the first-grade level—was minimal, at best.[14]

■ Based on the record presented to the Court in this case, and giving due deference to the determinations of the hearing officers and the educators who testified at the local hearing, whose expertise in the field of special education the Court cannot ignore, the Court finds that the preponderance of the evidence in this case supports the IEPC's placement of Emily at West Hills full-time, to be educated in the basic special education classroom part-time and mainstreamed at that school in unified arts classes the rest of the day.[15]

Plaintiff has not come forward with convincing evidence to support her contention that a program in Emily's neighborhood school, East Hills, with the increased involvement Mrs. Hudson wants her daughter to have in regular education 7th grade academic classes and decreased placement in special education services, will meet Emily's current educational needs. Given the undisputed record evidence of Emily's mental impairment, short of adding a special education basic classroom Learning Center at East Hills—something that would be cost-prohibitive for the School District particularly given the small severely handicapped student population of the district—no amount of supplementary aides and services would meet Emily's current needs.

■ For these reasons, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's IDEA claims. Accordingly, Count I of Plaintiff's Complaint will be dismissed.[16]

---

**14.** At oral argument, quoting from *Doe v. Board of Education of Tullahoma City Schools*, 9 F.3d 455 (6th Cir.1993), Plaintiff's counsel argued that even though West Hills might have a program that would be the educational equivalent of a "Cadillac", the statute *does not require* that Emily be provided with a Cadillac when a "Chevy" would serve the purpose. Plaintiff's reliance on *Tullahoma* is wholly misplaced for that case involved a factual situation that was entirely the reverse of that presented in this case. In the *Tullahoma* case, the parents of a learning disabled student did not want their child mainstreamed in the public school system at all and enrolled him in a private school specializing in learning disabilities. They then sought to require the school district to pay the private school tuition. The court refused to order the school system to pay the private school tuition because *it found that the least restrictive environment* which would benefit the child was the mainstream curriculum in the public school system with the provision of ancillary special services in the public school as recommended in the IEP. It was in this context that the Court of Appeals made its "Cadillac vs. Chevy" statement:

> The Act requires that the Tullahoma schools provide the educational equivalent of a serviceable Chevrolet to every handicapped student. Appellant, however, demands that the Tullahoma school system provide a Cadillac solely for appellant's use. We suspect that the Chevrolet offered to appellant is in fact a much nicer model than that offered to the average Tullahoma student. Be that as it may, we hold that the Board is not required to provide a Cadillac

and that the proposed IEP is reasonably calculated to provide educational benefits to appellant, and is therefore in compliance with the requirements of the IDEA.

9 F.3d at 459–460.

Thus, the *Tullahoma* court clearly did not hold, as Plaintiff suggests, that where both a "Chevy" and a "Cadillac" were available, courts had to place the child in the home school if that school was the one which offered the Chevy. Rather, the court simply held that the school was not required to offer a "Cadillac" program. The Court notes, however, that in this case, the West Hills Middle School appears to be a Cadillac, while, with respect to Emily's needs, the East Hills school program appears to be something less than a "serviceable Chevy."

**15.** To the extent that Plaintiff has continuously argued that this is a case in which the school district has violated the "mainstreaming" requirements of IDEA, the record makes clear that this contention is wholly without merit. While mainstreaming is required under the statute, nothing in the statute or regulations requires mainstreaming in all classes. All that is required is that the child be mainstreamed "to the maximum extent possible." For Emily, this requisite is clearly satisfied with the recommended mainstreaming in the unified arts (i.e., gym, music, home economics, etc.) classes at West Hills.

**16.** Since the hearing on the motions for summary judgment, Plaintiff has filed a motion "to submit additional evidence" contending that the

### D. *PLAINTIFF'S REHABILITATION ACT CLAIMS WILL ALSO BE DISMISSED.*

Count II of Plaintiff's Complaint alleges that, in addition to the Count I allegations of violation of IDEA, the placement of Emily at West Hills violates the least restrictive environment provisions of Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, and the attendant implementing regulations, 34 C.F.R. § 104.31 *et seq.*

Section 504 of the Rehabilitation Act prohibits discrimination on the basis of handicap by agencies receiving federal funds. The pertinent implementing regulations applicable to public schools are as follows:

**§ 104.33. Free appropriate public education.**

(a) *General.* A recipient that operates a public elementary or secondary education program shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.

(b) *Appropriate education.* (1) For the purpose of this subpart, the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34 [least restrictive environment], 104.35 [testing and evaluation], and 104.35 [procedural safeguards].

(2) *Implementation of an individualized education program developed in accordance with the Education of the Handicapped Act is one means of meeting the standard established in paragraph (b)(1)(i).*

34 C.F.R. § 104.33 (emphasis added).

With respect to "least restrictive environment", as Plaintiff acknowledged in her Complaint, Section 504's least restrictive environment regulations "mirror" the IDEA regulations. In pertinent part, these regulations provide as follows:

(a) *Academic setting.* A recipient to which this subpart applies shall educate, or shall provide for the education of, each qualified handicapped person in its jurisdiction with persons who are not handicapped *to the maximum extent appropriate to meet the needs of the handicapped person.* A recipient shall place a handicapped person in the regular educational environment operated by the recipient *unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily.* Whenever a recipient places a person in a setting other than the regular educational environment pursuant to this paragraph, it shall take into

---

Sixth Circuit's interpretation of the "additional evidence" provision of Section 1415(e)(2) of the IDEA in *Nashville and Davidson County Metropolitan Government v. Cook*, 915 F.2d 232 (6th Cir.1990), **requires** the Court to conduct an evidentiary hearing upon Plaintiff's request to hear additional expert testimony from the same experts who testified in the administrative proceedings regarding the benefits of lesser restrictive environments than the West Hills program and a placement of Emily in East Hills. Plaintiff misreads the *Nashville* case. In *Nashville*, the Sixth Circuit held that it was appropriate for the District Court to hear additional evidence concerning less restrictive placements for the plaintiff because "the [administrative] hearing officer failed to consider the statutorily least restrictive alternative requirement [and failed] to consider less restrictive placements." *Id.* at 235. This is not the case in the instant action.

In this case, the administrative record makes clear that both the local hearing officer and the state officer considered at length the pros and cons of the East Hills placement that Mrs. Hudson wanted for her daughter. There is nothing in the record of this case that resembles the absence of consideration given to alternative placements in the *Nashville* case. Moreover, the *Nashville* case makes clear that the Sixth Circuit views the matter of additional evidence to be one that rests in the sound discretion of the district court. *See* discussion at 915 F.2d at 234–235.

Here, all discovery in the case has closed and the motion deadline has passed. Given the extensive administrative record and discovery in this litigation, the Court finds no reason to take additional evidence.

For these reasons, the Court will DENY Plaintiff's Motion to Submit Additional Evidence.

account the proximity of the alternate setting to the person's home.

34 C.F.R. § 104.34 (emphasis added).

Plaintiff did not address her Count II allegations of violation of the least restrictive environment provisions of Section 504 in any of her summary judgment briefs or at oral argument, nor has she responded to Defendant's arguments for dismissal of Count II. Therefore, the Court may assume that Plaintiff is no longer pursuing her Section 504 claim.

■■■ Assuming, however, that Plaintiff still is pursuing her § 504 claim, as set forth *supra*, in Section B of this Opinion, the Court has determined that the School District has established by a preponderance of the evidence that Emily cannot be educated satisfactorily in the general education middle school program at East Hills Middle School and that her needs can best be met by a placement at West Hills as recommended by the IEPC. For this reason, the Court finds that Plaintiff has not established a violation of Section 504 or its least restrictive environment regulations. Therefore, summary judgment will be granted in favor of the Defendant on this claim, as well.[17]

## IV. CONCLUSION

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is hereby GRANTED and Plaintiff's Motion for Summary Judgment is hereby DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Submit Additional Evidence is DENIED.

17. Moreover, as pointed out by Defendant, Plaintiff did not allege any Section 504 violation at either the local-level or the state-level of the administrative proceedings. As Defendant points out, special education litigants are not entitled to relief under Section 504 unless they first initiate and exhaust all available administrative remedies. Section 1415(f) of IDEA, provides:

(f) **Effect on other laws.**
Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [Section 504] or other Federal statutes protecting the rights of children and youth with disabilities,

Accordingly, this case is hereby DISMISSED in its entirety, with prejudice.

except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter [IDEA], the procedures under subsections (b)(2) and (c) [providing for a local hearing determination and review by state agency] of this section <u>shall be exhausted to the same extent as would be required had the action been brought under this subchapter.</u>
20 U.S.C. § 1415(f) (emphasis added).
Since Plaintiff did not exhaust her administrative remedies with respect to her Section 504 claim, even if there were some merit to that claim, dismissal of Count II in this action would nonetheless be required.