**TROY SCHOOL DISTRICT and Board of Education of the Troy School District, Plaintiffs/Counter–Defendants,**

v.

**Spiro and Kimberly BOUTSIKARIS, on behalf of their son Jeremy Boutsikaris, Defendants/Counter–Plaintiffs.**

No. 01–75003.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 26, 2003.

John L. Gierak, Troy, MI, for plaintiffs.

Richard J. Landau, Ann Arbor, MI, for defendants.

## OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiffs Troy School District and its Board of Education (collectively the "District") commenced this suit in this Court on December 27, 2001, challenging an administrative decision in which modest compensatory educational services were awarded to one of the District's former students, Jeremy Boutsikaris. Jeremy's parents, Defendants Spiro and Kimberly Boutsikaris (the "Parents"), answered the complaint on their son's behalf, and also asserted counterclaims alleging that two Individualized Education Programs ("IEPs") prepared by the District during Jeremy's 1999–2000 school year failed to provide their son with a free appropriate public education ("FAPE") as required under the federal Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* This Court's subject matter jurisdiction rests upon the parties' pleas for relief under the IDEA.

By cross-motions filed on June 28, 2002, both sides now seek an award of summary judgment in their favor. Through these motions, both the District and the Parents seek to overturn portions of the October 1, 2001 administrative ruling by State Level Review Officer ("SLRO") Sidney Kraizman, while requesting that the balance of this ruling be affirmed. As discussed in detail below, this administrative decision was almost entirely favorable to the District, determining that the two IEPs prepared in January and May of 2000 generally provided Jeremy Boutsikaris with a FAPE. The lone exception, and the point now contested by the District, was the SLRO's finding that these IEPs failed to provide sufficient integration consultant services for the latter half of Jeremy's 1999–2000 school year. The SLRO awarded compensatory educational services to Jeremy to make up for this deficit, and the District now seeks to overturn this award. The Parents, for their part, challenge the SLRO's overarching determination that the two IEPs, with the sole exception identified above, otherwise provided Jeremy with a FAPE in accordance with federal and state law.

The Court heard oral argument on the parties' cross-motions on January 9, 2003. This hearing confirmed what had been foreshadowed both in the parties' written submissions and as long ago as the first pretrial conference with counsel—namely, that this litigation has little to do with the substantive rulings of the SLRO, much less the appropriate content of an educational program for Jeremy Boutsikaris. Rather, the principal concern of the parties and their counsel at this point is to obtain (in the case of the Parents) or thwart (in the case of the District) a potentially substantial award of attorneys' fees,

encompassing not only this action but the lengthy and multi-level administrative process that preceded it. Despite this unseemly relegation of the merits to a mere sideshow, the Court follows the lead of the administrative hearing officers, who carefully and comprehensively considered whether the IEPs prepared by the District met the governing legal standards of the IDEA and state law. As set forth below, upon reviewing the parties' briefs and the voluminous administrative record and considering the arguments of counsel at the January 9 hearing, the Court finds that the administrative decision of SLRO Kraizman should be affirmed in all respects.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The initial administrative decision in this case was rendered by Local Hearing Officer ("LHO") Lyn Beekman on February 20, 2001, following an extensive hearing conducted over seven days in September and November of 2000. While the parties—and, particularly, the Parents—challenge certain of this decision's factual findings and legal conclusions, they generally agree upon the factual background as set forth by the LHO. Accordingly, the following account borrows heavily from the LHO's decision.

Jeremy Boutsikaris was born on June 17, 1988, and was first determined to suffer from a speech and language impairment ("SLI") in March of 1991, when he was almost three years old. When Jeremy and his family moved to Troy in 1992, the plaintiff District assumed responsibility for developing IEPs for Jeremy and providing special educational services for his impairments. Over the years, the parties have prepared a number of IEPs for Jeremy on a roughly annual basis, and Jeremy has completed kindergarten through fifth grade at the District's Hill Elementary School. Throughout this time, Jeremy has retained his status as an SLI student and, in addition, he was found at the end of the 1996–97 academic year (his second-grade year) to be eligible for special educational services on the basis of a specific learning disability ("LD"). The parties agree that both of these disabilities have been present during the entire period of relevance to this case.[1]

### A. Jeremy's Past IEPs and Academic Performance

Throughout Jeremy's school-age years, certain aspects of his IEPs have remained fairly constant. He generally has spent 10–15 hours per week in the learning disabilities basic classroom, and the balance of his time in the general education program at Hill Elementary. Jeremy's time in the general program encompassed math, science, social studies, and "specials"—that is, music, art, and physical education. In addition, Jeremy received direct speech and language services several times a month, typically in 20–25 minute sessions, along with direct or consultative social work services a few times each month.[2]

It also is possible to generalize about Jeremy's performance under these IEPs. Under a variety of tests, Jeremy has consistently been found to have above average

---

1. For some reason, however, an IEP prepared on May 18, 1999 omitted any mention of Jeremy's SLI eligibility, and this error carried through to the January 18, 2000 and May 2, 2000 IEPs at issue here. The significance of this omission is addressed below.

2. "Direct" services are those provided directly to the student, while "consultative" services are furnished to the classroom teacher. In either event, the services are provided by an "integration consultant," sometimes referred to as a "teacher consultant."

intelligence; the administrative decisions uniformly characterize him as a "bright child." Jeremy also has performed reasonably well in his general education classes, receiving grades of Bs and one C during his fourth- and fifth-grade years. His disabilities have continued to manifest themselves, however, in the areas of written expression, basic reading skills, and reading comprehension. In particular, Jeremy has remained two or three grade levels behind his age-peers in these areas, and his test scores have placed him in the ninth percentile or lower. In short, while Jeremy perhaps was not falling further behind his classmates in these areas, neither was he closing the gap.[3]

### B. The January 18, 2000 IEP

In addition to the annual IEPs developed by the District, Jeremy was due for a three-year re-evaluation during the 1999–2000 school year (Jeremy's fifth-grade year). Accordingly, the District convened a Multi–Disciplinary Evaluation Team ("MET") for this purpose on January 18, 2000. In attendance were Jeremy's general education teacher, Adam Pennewell; his special education teacher, Karen Hurst; the integration consultant, Kathleen Fredrickson; various other school officials; and Jeremy's mother, Kimberly Boutsikaris. The MET confirmed Jeremy's continuing eligibility for special education services as learning disabled, but repeated the District's earlier error of failing to separately address Jeremy's eligibility as speech and language impaired. More specifically, the MET found that there was a severe discrepancy between Jeremy's ability and achievement in the areas of written expression, basic reading skills, and reading comprehension.

Immediately following this MET session, the District convened an IEP Team to determine the content of Jeremy's educational program for the remainder of the academic year. Under the terms of the January 18, 2000 IEP, Jeremy was placed in the learning disabilities basic classroom for ten hours per week, with the remainder of his time spent in the general education program. Jeremy's speech and language services were reduced from six to three 20–minute sessions per month, in light of his progress in this area. Finally, a new service was added to Jeremy's program, consisting of consultative (versus direct) integration consultant services of six 20–minute sessions per month.

During the course of this IEP Team meeting, Mrs. Boutsikaris expressed dissatisfaction with the services the District had proposed. First, she requested additional speech and language sessions, but apparently was told that these services were limited by the amount of time the District's speech teacher spent at Jeremy's school. Next, Mrs. Boutsikaris sought a more intensive reading program, through which the District would commit to a certain amount of one-on-one time between Jeremy and his special education teacher, Ms. Hurst.[4] The IEP Team reportedly advised Mrs. Boutsikaris that one-on-one teaching is a matter of methodology or teaching strategy, and thus is not an appropriate subject to address in an IEP. They also opined that one-on-one instruc-

---

3. Jeremy apparently made greater progress in his speech and language impairment, however. During an assessment in January of 2000, it was found that Jeremy's language was age appropriate, but that he continued to have a problem in pronouncing the consonant "R" in connected speech.

4. Throughout Jeremy's thirdthrough fifth-grade school years, Ms. Hurst apparently had been spending 30 or more minutes a day, four days a week on this sort of one-to-one direct instruction of Jeremy. This had not been reflected in Jeremy's IEPs, however.

tion should be provided as needed, with the teachers left free to reassess this on an ongoing basis.[5]

More generally, Mrs. Boutsikaris was concerned that the proposed IEP failed to ensure Jeremy's progress in his areas of difficulty. As support for this view, the Parents cite statements in the IEP that "progress has been minimal for the past 2 years," and that "lack of reading skills has impacted" Jeremy's progress. The Parents also point to the assessment of Jeremy's general education teacher that the boy had exhibited "very little" academic growth during the school year. In light of this concern that the proposed IEP was inadequate, Mrs. Boutsikaris refused to sign the January 18, 2000 IEP.

Despite the Parents' lack of consent, the District put this program into place for the remainder of Jeremy's fifth-grade year. The District sent the Parents a copy of the January 18, 2000 IEP, accompanied by a cover letter that invited them to call the District's special education supervisor "[i]f there are items in this recommended program you do not understand or feel should be changed, or if you disagree with these recommendations." (Plaintiffs' Motion, Ex. 11.)[6] The Parents received this letter on February 2, 2000, but did not contact the special education supervisor or otherwise request a hearing on their objections to the IEP. Mrs. Boutsikaris did, however, continue to communicate with Jeremy's teachers and the integration consultant regarding her son's educational program. She also began to explore the possibility of removing Jeremy from the public schools

and enrolling him in the Eton Academy in Birmingham, Michigan, and she informed Jeremy's teachers and other District officials about this possibility.

## C. The May 2, 2000 IEP

On May 2, 2000, an IEP Team was convened to develop an educational program for Jeremy's sixth-grade year, his first at middle school. The Team concluded that Jeremy remained eligible for special education services as learning disabled, but again perpetuated the error of failing to consider whether Jeremy retained his SLI eligibility. According to her testimony at the administrative hearing, Ms. Hurst reported to the Team that Jeremy was reading at the fourth-grade level, and that he was able to read in a small group, as opposed to the one-to-one interaction that was required when Ms. Hurst first began working with Jeremy in the third grade. (*See* 9/26/00 Hearing Tr. at 86–91.)

Under the program developed by the IEP Team, Jeremy was to spend three hours each day in the middle school's special education resource room, with two hours of this time devoted to reading and writing and the remaining hour spent on reading and writing strategies. Jeremy would then spend the rest of his day in general education classes in mathematics, science, physical education, and various "exploratory" subjects. Finally, the May 2, 2000 IEP called for Jeremy to receive three 25-minute sessions per month in speech and language services, plus three

---

5. Mrs. Boutsikaris apparently sought the addition of other specific goals and objectives to the IEP. It appears that Jeremy's teachers and the integration consultant met with Mrs. Boutsikaris in February of 2000 to address these concerns, and that the IEP was modified to accommodate at least some of her requests for additional specifics.

6. Unfortunately, the District sent the wrong form letter to the Parents, using one stating that "[w]e are sorry that you were unable to attend" the IEP Team meeting. (*Id.*) As noted, Mrs. Boutsikaris did, in fact, attend this meeting.

20–minute sessions per month of direct integration consultant services.

Mrs. Boutsikaris attended this May 2, 2000 IEP Team meeting, and voiced many of the same objections that she had raised at the January meeting. In particular, she again sought a specific commitment that the District would provide a definite amount of one-on-one time between Jeremy and his special education teacher. The other IEP Team members again explained why, in their view, it was inappropriate to address such specific methodological matters in an IEP, and they sought to assure Mrs. Boutsikaris that Jeremy would receive one-on-one instruction as deemed necessary by his teachers.

Mrs. Boutsikaris remained unpersuaded, however, and reflected her continuing concern by expressly noting her disagreement with the proposed IEP and requesting a due process hearing to address her objections. In addition, she presented the IEP Team with a letter informing the District of the Parents' decision to enroll Jeremy at Eton Academy for the 2000–01 school year.[7] In this letter, the Parents opined that the District was obliged to pay Jeremy's private school tuition, in light of its failure to provide Jeremy with a FAPE as required by law.

### D. Procedural Background

Pursuant to the Parents' request, a due process hearing was held over seven days in September and November of 2000, presided over by Local Hearing Officer ("LHO") Lyn Beekman. The parties presented the testimony of fourteen witnesses, and submitted over 400 exhibits for the LHO's consideration. In a thorough, 25–page opinion dated February 20, 2001, the LHO found that the May 2, 2000 IEP provided Jeremy with a FAPE in accordance with federal and state law, and that the Parents were not entitled to reimbursement of the expenses they incurred in enrolling Jeremy at the Eton Academy. Regarding the Parents' challenge to the January 18, 2000 IEP, the LHO determined that this matter was moot, in light of the Parents' failure to request a hearing or otherwise object to the implementation of this IEP during the few months that it remained in effect.

The Parents appealed the LHO's decision to the Michigan Department of Education, which appointed Sidney Kraizman as State Level Review Officer ("SLRO") to preside over this appeal. In a comprehensive, 43–page amended decision issued on October 1, 2001, SLRO Kraizman largely affirmed the findings of the LHO, with two exceptions. First, the SLRO disagreed with the LHO's conclusion that the January 18, 2000 IEP was irrelevant to the proceedings, and instead elected to consider whether this IEP provided Jeremy with a FAPE during the limited time it was in effect. As to this inquiry, the SLRO concluded that the January 18, 2000 IEP failed to provide sufficient integration consultant services, and that the appropriate amount was fifteen (versus six) 20–minute sessions per month.[8]

In a supplemental decision dated November 27, 2001, SLRO Kraizman largely denied both the Parents' and the District's motions for reconsideration. The SLRO

---

7. Although, as noted, Mrs. Boutsikaris apparently had mentioned the possibility of enrolling Jeremy at Eton during various discussions with school officials, this matter was not explored at the May 2 IEP Team meeting.

8. As noted by the District, the difference between the amount of services provided in the IEP and the amount ordered by the SLRO is nine 20–minute sessions per month, for a total of three hours per month for the roughly six-month period that the January 18, 2000 IEP remained in effect.

took the opportunity, however, to explain precisely how the Parents and Jeremy were to be compensated for the shortfall in integration consultant services under the January 18, 2000 IEP. Specifically, the SLRO ordered the District to provide compensatory instructional services to Jeremy through either after-school tutoring or a summer program, with these services to be completed by the end of August, 2002.

The District brought this suit on December 27, 2001, challenging the SLRO's decisions to consider the Parents' objections to the January 18, 2000 IEP, and to award compensatory educational services in light of the purported shortfall in integration consultant services under this IEP. The Parents, in turn, have asserted counterclaims alleging that the District's January 18 and May 2, 2000 IEPs did not provide a FAPE for their son Jeremy as required by law. Each side has now moved for summary judgment in its favor, seeking to overturn the unfavorable aspects of the SLRO's rulings.

### III. *ANALYSIS*

### A. The Standards Governing the Parties' Cross–Motions

The parties have cast their present motions as seeking awards of summary judgment in their favor. There is reason to believe, however, that summary judgment is not the proper procedural mechanism for resolving the issues raised by the parties. The Court, after all, is not writing on a blank slate, but instead has the benefit of administrative decisions which have addressed the parties' various points of contention. Under these circumstances, where the parties are appealing an administrative ruling, and where they do not rely

upon evidence outside the four corners of the administrative record, the Sixth Circuit has indicated that it is inappropriate to resolve such a matter by reference to summary judgment principles. *See Dong v. Board of Educ. of Rochester Cmty. Schools,* 197 F.3d 793, 798–99 (6th Cir. 1999); *Doe v. Metropolitan Nashville Public Schools,* 133 F.3d 384, 387 & n. 2 (6th Cir.1998).

▮▮▮ Rather, the Sixth Circuit has instructed that this Court should apply a "modified *de novo*" standard in reviewing the parties' various challenges to the administrative rulings of the state hearing officers. *See Burilovich v. Board of Educ. of Lincoln Consolidated Schools,* 208 F.3d 560, 565 (6th Cir.2000); *Dong,* 197 F.3d at 800; *Renner v. Board of Educ. of Public Schools of Ann Arbor,* 185 F.3d 635, 641 (6th Cir.1999). Under this standard, the Court is obliged to independently reexamine the evidence, but with a degree of deference to the determinations made in the course of the administrative proceedings. *See Dong,* 197 F.3d at 800.[9] The Supreme Court has explained:

We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP ... demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

Thus the provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational

---

**9.** Where, as here, "there is a conflict between the holdings of the local and state hearing officers, the court must defer to the state hearing officer's decision in reviewing the

record on appeal." *Burilovich,* 208 F.3d at 567. Thus, to the extent that they diverge, the SLRO's ruling is controlling over the LHO's decision as this Court conducts its review.

policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that [20 U.S.C.] § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings. And we find nothing in the [IDEA] to suggest that merely because Congress was rather sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the [IDEA] itself. *Board of Educ. of Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034 3050–51, 73 L.Ed.2d 690 (1982).

The Sixth Circuit has recently elaborated on *Rowley*'s requirement that "due weight" be given to the administrative proceedings. First, the Court must inquire "whether the state has complied with the procedures set forth in the IDEA" in formulating an IEP. *Burilovich,* 208 F.3d at 565. As to this procedural matter, the courts insist upon "strict[ ] . . . compliance," but "technical deviations will not render an IEP invalid." 208 F.3d at 566 (internal quotations and citations omitted). Next, the Court "assesses whether the IEP developed through the [IDEA's] procedures is reasonably calculated to enable the child to receive educational benefits." 208 F.3d at 565. "Michigan has added to this standard by requiring that an IEP be designed to develop the 'maximum potential' of a child." 208 F.3d at 565 (quoting Mich. Comp. Laws § 380.1751(1)).

■ As to this latter, substantive inquiry, it is here that the courts must grant a degree of deference to the state administrative determination on appeal. Specifically, "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich,* 208 F.3d at 567. However, "[a] court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable." 208 F.3d at 567. This rule reflects the reality that "federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the factfinding of a state agency, which is presumed to have expertise in the field." 208 F.3d at 566.

Despite the Sixth Circuit's rather extensive explication of the governing standards, the parties have engaged in a lengthy debate about the burden of proof in this case. The Court does not share the parties' apparent confusion on this point. Rather, it seems reasonably clear that both sides are contesting portions of the SLRO's administrative decision, and that each side, consequently, bears the burden of establishing a basis for overturning the rulings that it has challenged. In particular, the District must show that the SLRO's award of compensatory educational services should be set aside, and the Parents must show that the SLRO was unjustified in concluding that, with one exception, the January 18 and May 2, 2000 IEPs provided their son Jeremy with a FAPE. These respective showings must be made by reference to the standards set forth above. Accordingly, the Court turns to this inquiry.

## B. The School District Has Failed to Establish a Basis for Overturning the SLRO's Award of Compensatory Educational Services.

As noted, the District largely prevailed in the administrative proceedings, with both the LHO and the SLRO concluding that the May 2, 2000 IEP provided Jeremy with a FAPE, and with the SLRO further determining that the January 18, 2000 IEP was deficient in only one respect—namely, it provided an insufficient amount of integration consultant services. The District now contests this one adverse portion of the SLRO's decision, arguing that it is erroneous in a number of respects. Although the question is a close one, the Court concludes that the SLRO's ruling on this point is entitled to deference, and should not be overturned.

As a threshold matter, the District contends that the LHO was correct in disregarding the January 18, 2000 IEP as moot, and that the SLRO erred in electing to consider this IEP. The District points out that, by the time the January 2000 IEP was addressed at a due process hearing later that year, it had already been superseded by the May 2000 IEP. Consequently, the earlier IEP governed only the latter portion of Jeremy's fifth-grade year, and had no prospect of affecting his longer-term education. The District also notes that the statements and submissions of the Parents and their counsel prior to the due process hearing are less than clear and definitive in expressing an intent to challenge both the January and May IEPs.

Nonetheless, the minimal authority that exists on this issue suggests that the SLRO acted reasonably in agreeing to consider the January 2000 IEP. As observed in the SLRO's decision, the pertinent state regulation permits parents to appeal "at any time" a school district's decision to proceed with an IEP. Mich. Admin. Code R. 340.1722a(2). The analogous federal regulation is silent as to the deadline for a parent to request a due process hearing, *see* 34 C.F.R. § 300.507(a)(1), but an accompanying appendix construes this regulation as authorizing parents to "initiate a due process hearing at any time," 34 C.F.R. pt. 300, app. A. Thus, while it plainly would serve a practical purpose to insist that parents promptly request a due process hearing, as this would facilitate the quick correction of any deficiencies in an IEP, the District has failed to identify any statutory provision or regulation that imposes such a requirement.

Nor do the cases cited by the District stand for this principle. In one, *Hines v. Tullahoma City School System*, 156 F.3d 1229, 1998 WL 393814, at *3 (6th Cir. Aug.6, 1998), the parents were given notice of a meeting to develop an IEP, but then failed to attend, and instead placed their child in a private school based upon "their belief that her needs were beyond the competence of the school system." The Sixth Circuit held that the parents were not entitled to reimbursement for the cost of this private education, because they had "failed to follow the procedural requirements of IDEA, and because they did not give the school a chance to remedy any problems that may have existed in [the] IEP." 1998 WL 393814, at *3. Similarly, in *Wise v. Ohio Dep't of Education*, 80 F.3d 177, 184–85 (6th Cir.1996), the Court found that the parents had acted at their own financial risk and were not entitled to reimbursement for unilaterally enrolling their child in a private residential facility, where they never sought a due process hearing or otherwise gave notice to their local school district of their dissatisfaction with a proposed IEP.

Here, by contrast, the Parents undeniably did invoke IDEA's procedural mechanisms for challenging an IEP; they simply

failed to do so before a subsequent IEP was put into place. In addition, the District clearly was on notice of the Parents' dissatisfaction with the January 18, 2000 IEP—whereas the Parents previously had consented to and signed each of the IEPs developed by the District, they notably refused to do so in this instance, and Mrs. Boutsikaris expressly stated her objections during the course of the January 18, 2000 IEP Team meeting. Finally, there is no concern here that the District has been denied the opportunity to present arguments and evidence as to the sufficiency of the January IEP; rather, as observed by the SLRO, "the school district vigorously defended both the 1/18/00 and the 5/2/00 IEP[s] at the due process hearing." (SLRO Amended Decision at 15.) Thus, while the Court is sympathetic to the District's view that a due process hearing should not be used as a mechanism for revisiting past IEPs that no longer affect a student's ongoing education, the Court simply is unable to identify any legal authority for the proposition that the Parents here, under the particular facts and circumstances of this case, surrendered their right to challenge the January 18, 2000 IEP at the due process hearing convened later that year.

■ Turning, then, to the substance of the SLRO's ruling that this January 2000 IEP provided an inadequate amount of integration consultant services, the District protests that this decision was cut out of whole cloth by the SLRO alone, where (i) the Parents never advocated additional services of this sort, and (ii) no witness who testified at the due process hearing explicitly identified this as a weakness of the IEP or opined that additional integration consultant services were warranted. And, indeed, the Court's independent review confirms the District's characterization of the record. Yet, nothing in the

IDEA or the case law requires that the elements of an IEP be limited solely to those services advocated by one party or the other. Rather, as stated earlier, the dispositive inquiry is whether an IEP is "reasonably calculated to enable the child to receive educational benefits," *Burilovich*, 208 F.3d at 565—or, to put it more precisely under the present procedural posture, whether the SLRO's determination of the appropriate elements of an IEP is justified in light of the SLRO's "presumed educational expertise, a fair estimate of the worth of the testimony, or both," 208 F.3d at 567.

The Court holds that it is. Though the record does not necessarily compel the conclusion reached by the SLRO, the Court nonetheless finds sufficient evidence to support it. First, the SLRO cited various materials in the record, including a report prepared by Jeremy's fifth grade general education teacher, which indicated that Jeremy was making very little progress toward overcoming his reading and writing deficiencies as of the time the IEP Team convened on January 18, 2000. The Team itself evidently recognized this, as it recommended that Jeremy's existing fifth-grade IEP be changed to include six 20–minute sessions a month of consultative integration consultant services, where previously no such services were being provided.

Next, the SLRO pointed to testimony that these integration consultant services were having a positive impact upon Jeremy's academic progress. The integration consultant who provided these services, Ms. Fredrickson, testified that Jeremy's performance in social studies and math improved with her assistance, through such means as study guides that she provided for Jeremy's use in preparing for tests, team reading of test questions before Jeremy began working on the an-

swers, tips for Jeremy to improve his listening skills in class, and the use of reading buddies to assist Jeremy in reading the written materials distributed by his fifth-grade general education teacher. Jeremy's general education teacher, Mr. Pennewell, echoed this view, testifying that "[w]hen we brought in the [integration consultant], I saw a lot of improvement," (9/25/00 Hearing Tr. at 131), whereas he had reported at the time of the January 18, 2000 IEP Team meeting that Jeremy had shown "very little" academic growth to that point of the school year.

All of this evidence, of course, could be viewed as suggesting that the additional services provided through the January 18, 2000 IEP were successful in improving Jeremy's academic performance, and thereby satisfied the District's obligation to provide a FAPE. Yet, the SLRO noted one significant flaw in this proposition: "In fact the Integration Consultant Ms. Fredrickson provided not only consultative services to Mr. Pennewell, the general education teacher, but she also provided instructional services" to Jeremy himself. (SLRO Amended Decision at 35.) The SLRO concluded, in other words, that Jeremy's improvement was attributable, at least in significant part, to the fact that Ms Fredrickson *deviated from*, rather than adhered to, the strict terms of the January 2000 IEP. While the SLRO credited the District with the recognition that a change in Jeremy's fifth-grade IEP was warranted, in light of his limited progress in the first half of the academic year, the District was faulted for the specific change it elected to make—namely, *consultative rather than* direct integration consultant services, and an insufficient number of monthly sessions of these services.

The Court finds that the evidence identified by the SLRO, viewed in its totality

and combined with the SLRO's presumed educational expertise, is sufficient to justify his conclusion that the amount and type of integration consultant services provided under the January 18, 2000 IEP was inadequate to ensure a FAPE for Jeremy. To be sure, it is difficult to discern any direct evidentiary support for the precise amount of additional services—fifteen versus six monthly sessions—ordered by the SLRO. Additionally, it could be argued that this ruling is somewhat at odds with the SLRO's further conclusion that the May 2, 2000 IEP, with its mere three monthly sessions of direct integration consultant services, satisfied the District's obligation to provide Jeremy with a FAPE.

Upon careful consideration, however, the Court finds that these considerations do not undermine the SLRO's decision. First, regarding the proper amount of integration consultant services, the SLRO was obliged to order *some* specific number of additional monthly sessions, and the District certainly has not proposed some other, more appropriate figure. Next, while the May 2000 IEP upheld by the SLRO includes fewer monthly sessions of integration consultant services, the SLRO explained that the middle school program offered other services that compensated for this reduction. In particular, while Jeremy spent ten hours per week, or two hours per day, in the learning disabilities basic classroom during his fifth-grade academic year, the May 2000 IEP called for him to spend three hours per day in the middle school's special education resource room, including an hour a day devoted to reading and writing strategies. The SLRO viewed this daily session as "supportive of Jeremy's work in the general education classes," (SLRO Amended Decision at 37), and hence as a substitute for the diminished integration consultant services.

In sum, the SLRO's decision can fairly be read as determining that a suitable IEP for Jeremy would involve ***both*** direct instruction to improve his reading and writing performance ***and*** more general assistance in the development of strategies for success in the general education classroom despite his learning disabilities. The SLRO then concluded that the IEP for the latter half of Jeremy's fifth-grade year failed to provide a sufficient amount of the latter type of services, but that the IEP for the following school year remedied this deficiency. The Court finds that these conclusions, on matters lying within the SLRO's presumed educational expertise, are reasonable in light of the administrative record, and therefore must be affirmed.

### C. The Parents Have Failed to Establish a Basis for Overturning the SLRO's Ruling That the January and May 2000 IEPs, with One Limited Exception, Provided Jeremy with a FAPE.

Through their counterclaims, the Parents seek to overturn the considerable portions of the SLRO's ruling that were decided adversely to them, and to recover the expenses they have incurred in educating their son Jeremy at the private Eton Academy. Though the Parents are pursuing several means to this end, advancing claims under the IDEA, the Rehabilitation Act of 1973, the Americans with Disabilities Act, and 42 U.S.C. § 1983, they acknowledge that the lynchpin of all of these theories of recovery is that the January 18, 2000 and May 2, 2000 IEPs failed to provide Jeremy with a FAPE.[10] Upon reviewing the administrative record, however, the

Court finds that the SLRO reasonably concluded otherwise.

■ The Parents first assert that various procedural defects undermined the May 2, 2000 IEP Team meeting, and hence its final work product, the IEP itself. One of these, in their view, was the District's apparently inadvertent omission of Jeremy's SLI-based eligibility for educational services. As a result, the Parents argue, Jeremy was denied the increased speech and language services sought by Mrs. Boutsikaris at the January and May 2000 IEP Team meetings. Yet, as explained by the LHO and affirmed by the SLRO, the District's oversight did not affect the IEP Team's determination of the appropriate educational services for Jeremy. Rather, the Team meetings in January and May of 2000, as in the past, continued to address Jeremy's speech and language needs, and the resulting IEPs continued to offer services to address these needs. More specifically, the SLRO noted that two school speech pathologists testified at the due process hearing that the District's omission of Jeremy's SLI eligibility had no impact upon the services actually offered to Jeremy under the January and May 2000 IEPs. Thus, the Court concurs in the SLRO's conclusion that this procedural violation was merely technical, and does not render the resulting IEPs invalid.

The Parents next contend that the IEP Team was not sufficiently informed about the extent to which Jeremy's special education teacher, Ms. Hurst, had engaged in one-on-one instruction of Jeremy. Ms. Hurst estimated that she had provided 30 minutes a day, four days a week of such

---

**10.** Of course, the SLRO found that these IEPs failed to provide Jeremy with a FAPE, to the extent that they failed to provide a sufficient amount of direct integration consultant services for the latter half of Jeremy's fifth-grade year. Yet, the SLRO already has awarded compensatory educational services to remedy this deficiency, and the Parents have not demonstrated an entitlement to further relief for this violation under any of their various theories of recovery.

instruction during Jeremy's three years in her class, but testified that the May 2000 IEP Team was not expressly advised of this practice. Rather, she opined only that the remaining IEP Team members were aware of her occasional individualized instruction of Jeremy, but not the precise amount of this instruction. The Parents argue that the IEP Team should have been provided with this information, and that, because they were not, they failed to appreciate the need to include specific one-on-one instructional services in the resulting IEPs.

The Court finds that the LHO and SLRO thoroughly and reasonably addressed this point in their comprehensive decisions. As observed by the LHO, "the record clearly reflects [that] the parent was told at the May IEP that Ms. Hurst had been working with [Jeremy] one-on-one a lot for a period of time," and that this matter "also [was] discussed at the January 2000 IEP" Team meeting. (LHO Decision at 13.) Indeed, Mrs. Boutsikaris plainly was aware of this fact, as it formed the basis for her objection at the January and May meetings that Jeremy's IEPs should specify a particular, fairly intensive level of one-on-one instruction. The record indicates that the IEP Team's failure to adopt Mrs. Boutsikaris' position was not a result of its lack of awareness of the amount of one-on-one instruction Jeremy had been receiving, but rather was due to its belief that it was preferable to leave the precise amount of this instruction for Jeremy's teachers to determine on an as-needed basis. Accordingly, the Parents' protest on this point is more substantive than procedural, and will be revisited as such below.

■ The same can be said for the Parents' remaining procedural challenges: (i) that the IEP Team failed to adequately address Jeremy's high academic potential

and his failure to reach this potential in formulating his IEPs; (ii) that the Parents were insufficiently informed about the full range of evaluative materials, apart from standardized tests, upon which the IEP Team relied in determining that Jeremy was performing at or near grade level in some areas; and (iii) that the IEP Team failed to consider whether Eton Academy would be an appropriate placement for Jeremy, despite the awareness of at least some Team members that Mrs. Boutsikaris was exploring this option. Each of these objections is premised upon the Parents' belief that Jeremy was not performing to his potential, and that the IEP Team failed to fully appreciate and address this fact in formulating educational programs for Jeremy. Yet, Mrs. Boutsikaris clearly presented these points at the IEP Team meetings; the other Team members simply declined to adopt her views. The Court views this matter as substantive rather than procedural, because it turns upon the question whether the District fulfilled its duty to prepare IEPs which were "reasonably calculated to enable [Jeremy] to receive educational benefits" and were "designed to develop [his] maximum potential," *Burilovich*, 208 F.3d at 565 (internal quotations and citations omitted), or whether the District instead should have offered more or different educational services. Regarding the Parents' characterization of this issue as procedural, it is enough to observe that there is ample support in the record for the SLRO's conclusion that the Parents "meaningfully participated" in the development of the January and May 2000 IEPs. (SLRO's Amended Decision at 26.)

■ Consequently, the Court turns to the substantive prong of its inquiry. As the Parents themselves acknowledge in their response to the District's motion, the SLRO issued an "exhaustively detailed"

decision in this case, and the Parents "bear[ ] a heavy burden in seeking to disturb the outcome of this carefully administered review process." (Defendants' Response Br. at 1.) Moreover, there is no doubt that the substantive terms of an IEP are a matter within the "presumed educational expertise" of the SLRO, and hence this Court must defer to the SLRO's decision so long as it is "reasonable." *Burilovich*, 208 F.3d at 567. As discussed below, the Court finds that such deference is appropriate here.

The Parents' general premise underlying their substantive challenges to the January and May 2000 IEPs is that their son Jeremy repeatedly exhibited high academic potential in a series of assessment tests administered over a number of years, and yet was not achieving this potential at school. Under these circumstances, the Parents reason that the educational services provided by the District over the years were not working and needed to be changed. Despite this, the Parents view the January and May 2000 IEPs as offering a "virtually unchanged educational program" that had proven ineffective to that point. (Defendants' Motion, Br. in Support at 16.)

The Court does not question the strength or good faith of the Parents' beliefs on this subject, nor is there any doubt that their first and foremost objective is to see that Jeremy reaches his maximum potential. Nonetheless, it is not the Court's present task to decide whether the Parents or the District have devised a better plan for Jeremy's education. Nor, as the Court has previously observed, is it the duty of the judiciary to determine whether a "Cadillac" educational program might be available, as opposed to the "Chevy" being offered by the District. *See Hudson v. Bloomfield Hills Public Schools*, 910 F.Supp. 1291, 1305 n. 14 (E.D.Mich.1995),

*aff'd*, 108 F.3d 112 (6th Cir.1997). Rather, as indicated earlier, the Court's inquiry is a narrow one—namely, whether the SLRO's decision as to the suitability of the January and May 2000 IEPs is justified on the basis of the SLRO's "presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich*, 208 F.3d at 567.

■ This Court cannot readily improve upon the thorough discussions of the LHO and SLRO on this point. The LHO, in particular, comprehensively addressed the evidence that Jeremy had progressed at about the same rate as his nondisabled peers, but had not significantly "closed the gap" in those areas—specifically, reading and writing skills—in which he lagged behind his classmates. (*See* LHO Decision at 6–7, 17–18.) The key question is whether the District's plan to address this challenge was sufficient to fulfill its statutory obligation under the IDEA, or whether more or different services should have been offered. In advocating the latter position, the Parents point to the testimony of psychologist Roger Lauer, who "proposed that 25 hours of Jeremy's 30–hour school week be spent in remedial instruction in a classroom with not more than 8 students to 1 teacher," and that "2 hours each day of the remedial instruction be one-to-one direct instruction in reading and writing skills." (LHO Decision at 18.)

The administrative hearing officers concluded, and the Court agrees, that the District identified a sufficient basis for the somewhat different balance struck in the January and May 2000 IEPs. In particular, the IEP Team proposed that Jeremy's middle school day be evenly divided between special and general education classes, with the former portion devoted to the development of Jeremy's reading and writing skills and strategies. The Team members opined that this mix was appro-

priate, because it provided an opportunity for addressing Jeremy's areas of weakness while still preserving his interactions with his general education peers in those areas, particularly math and science, where he had demonstrated an ability to perform at grade level. The record supports the view that Jeremy could succeed in certain grade-level general education subjects, as he had received reasonably good grades in these subjects in his later elementary-school years. The record likewise provides sufficient support for the IEP Team's conclusion that Jeremy could continue to make reasonable progress with 15 hours per week of special education classes devoted to reading and writing skills and strategies, given that he had demonstrated some progress in an elementary school program that had provided only 10 hours per week of special education classes. Indeed, there is some evidence that, in the area of reading, Jeremy actually had "closed the gap" somewhat during his fifth-grade year, as Ms. Hurst reported that he was reading at the fourth-grade level by May of this year, and had achieved what she termed a "breakthrough" near the end of fifth grade. Under this record, the Court finds no basis to overturn the SLRO's conclusion that the January and May 2000 IEPs provided Jeremy with a FAPE, with the limited exception of insufficient integration consultant services in the latter portion of Jeremy's fifth-grade year.

This leaves only the Parents' contention that these IEPs were fatally undermined through their failure to ensure a definite amount of one-on-one remedial instruction in Jeremy's areas of weakness, reading and writing. The parties have offered, in essence, a "battle of the experts" on this topic. The Parents, in particular, cite the testimony of psychologist Roger Lauer, who opined that Jeremy should be provided with two hours per day of one-to-one direct instruction in reading and writing skills. The District, for its part, points to evidence of Jeremy's progress under the "as needed" program provided by his special education teacher, as well as testimony from District staff opining that it should be left to the professional judgment of Jeremy's teachers to determine the appropriate balance of one-on-one and group instruction.

Again, the Court finds it appropriate to defer to the SLRO's resolution of this matter within his presumed educational expertise. The SLRO identified specific reasons for discounting the opinion of Dr. Lauer, finding that this opinion rested in part upon assumptions that were not borne out in the record. Notably, the LHO expressed much the same doubt about Dr. Lauer's testimony, stating that it appeared to rest upon a "lack of information" on certain points. (LHO Decision at 20.) Moreover, while neither the LHO nor the SLRO accepted the District's broad claim that the issue of one-on-one instruction is wholly "methodological," and hence outside the scope of an IEP, both hearing officers explained in detail their grounds for concluding that it would not be appropriate in Jeremy's case to mandate a specific amount of this type of instruction, to the exclusion of small group or other forms of instruction that had proven effective for Jeremy at times in the past. The Parents have failed to identify a legal basis for the Court to overturn this careful and thorough analysis.

At bottom, the Parents are dissatisfied with the progress the District has been able to achieve, citing a persistent discrepancy between Jeremy's academic potential and his actual results in the classroom. They are hardly to be faulted for this, and it is clearly their right to insist that the District is doing all that the law requires

to ensure that Jeremy's maximum potential is achieved. Yet, all are agreed that Jeremy *does* suffer from disabilities that impede his academic progress, and this must be factored into any assessment of the adequacy of the educational services provided by the District to Jeremy. Under these circumstances, a gap between potential and performance does not serve as conclusive proof of deficient educational services, but only demonstrates a need for services reasonably calculated to reduce and, one hopes, ultimately eliminate this gap. The SLRO found that the January and May 2000 IEPs provided such services for Jeremy (with one exception), and the Court has identified no basis for disturbing this conclusion.

## D. Final Observations

To this point, the Court has addressed the parties' arguments at face value, as though they were the principal focus of this litigation. Such is not the case, however. As indicated at the outset, these substantive matters are a mere preamble to the parties' chief concern—namely, whether the Parents will be awarded their attorneys' fees under 20 U.S.C. § 1415(i)(3)(B). This became apparent to the Court at the very first Rule 16 conference in this suit, and counsel candidly confirmed this point at the January 9, 2003 hearing. Amidst all of this strategic maneuvering over attorneys' fees, it appears that counsel (and perhaps the parties themselves) have lost sight of the goal shared by the Parents and the District alike back in early 2000—to ensure that Jeremy Boutsikaris was provided with educational services that would meet his needs and help him to achieve his academic potential. Back when this was the focus of the parties' efforts, the record reveals that the District staff and the Parents worked diligently, cooperatively, and in good faith, and that their differences were relatively modest, centered upon the legitimate issue of how best to overcome Jeremy's deficiencies in reading and writing.

Regrettably, the attorneys entered the picture and the focus changed dramatically. This litigation has devolved largely to the unseemly spectacle of lawyers fighting over attorneys' fees. Although counsel protested at the January 9 hearing that this is an inevitable byproduct of the federal statutory scheme, the Court cannot accept this argument. One need only look, for example, at the voluminous transcript of the seven-day due process hearing in this case, which is littered with lengthy speaking objections by counsel on such formalistic evidentiary matters as a witness's personal knowledge, matters which a competent hearing officer plainly would be capable of handling without "help" from the attorneys. Similarly, the Court is struck by the offhand fashion in which the Parents have presented their sole affirmative challenge in this case, regarding the extent to which the January and May 2000 IEPs provided Jeremy with a FAPE. This issue has been addressed as a mere afterthought, tucked away near the end of the Parents' motion and with little supporting argument.

 Under this record, it appears that the lawyers became immersed in the "battle," and perhaps failed to counsel their clients at the outset to weigh their fairly narrow differences against the potentially enormous cost of obtaining a slightly more favorable outcome through lengthy and contentious administrative and judicial proceedings. Although the IDEA allows for the possibility that the Parents might recover some of these costs, the Court does not view this as an expression of congressional intent that parties and their counsel should feel free to employ any and

738

all conceivable means to achieve even a modest goal, or that attorneys no longer have the obligation to inform their clients about the costs and benefits of legal proceedings. Rather, the Court assumes that Congress acted with its usual intent in authorizing awards of attorneys' fees under the IDEA—namely, to encourage parents, even those with limited means or resources, to pursue good-faith challenges to deficiencies in a school district's educational plan for their child. Unfortunately, there is little about the present litigation that appears to advance this goal.

### IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' June 28, 2002 Motion for Summary Judgment is GRANTED IN PART, to the extent that it challenges Defendants' counterclaims, and is otherwise DENIED. IT IS FURTHER ORDERED that Defendants' June 28, 2002 Motion for Summary Judgment is GRANTED IN PART, to the extent that it challenges Plaintiffs' claims, and is otherwise DENIED. Through these rulings, the Court AFFIRMS in all respects the determinations of the State Level Review Officer in his Amended Decision and his Decision as to Motions for Reconsideration.